Opinion
 

 BROWN, J.
 

 The issue in this case is whether a workers’ compensation insurer is immune from civil liability under Insurance Code
 
 [1]
 
 section 11758 for allegedly misallocating an insured employer’s expenses and reporting that misinformation to a ratemaking organization, resulting in higher premiums for its insured. The trial court denied petitioner State Compensation Insurance Fund’s (SCIF) motion for judgment on the pleadings, and the Court of Appeal summarily denied the insurer’s petition for writ of mandate and request for immediate stay. While the question is close, we conclude section 11758 does not immunize SCIF from civil liability under these circumstances. We therefore affirm the judgment of the Court of Appeal summarily denying the petition for writ of mandate and discharge the order to show cause.
 

 I. Factual and Procedural Background
 

 Prior to January 1, 1995, minimum premiums for workers’ compensation insurance were set by the Department of Insurance.
 
 [2]
 
 (Former § 11736, Stats.
 
 *933
 
 1977, ch. 459, § 3, p. 1514, repealed by Stats. 1993, ch. 228, § 1, p. 1793.) In calculating premiums, the department relied on the Workers’ Compensation Insurance Rating Bureau (Rating Bureau) to gather and process the relevant financial information from insurers. SCDF is a public enterprise fund, established by law as a competitive insurance carrier. (1 Hanna, Cal. Law of Employee Injuries and Workers’ Compensation (rev. 2d ed., Tancor edit., 2000) Workers’ Compensation System, § 1.20[1], pp. 1-70 to 1-71.)
 

 In April 1994, plaintiffs Schaefer Ambulance Service, Inc., Sectran Security, Inc., and Universal Courier Limited (collectively Schaefer), on behalf of themselves and all others similarly situated, filed a first amended class action complaint against SCDF. Schaefer alleged breach of the implied covenant of good faith and fair dealing and negligence, and sought declaratory relief, compensatory and punitive damages, attorney fees, and costs.
 

 Plaintiffs alleged they were “typical members of an ascertainable class of approximately 300,000 business entities within the State of California who have purchased workers’ compensation liability insurance from SCDF during the calendar years January 1, 1984 through December 31, 1992, and who, during that relevant time period, have had claims litigated against them by one or more of their injured workers.” Each insured’s policy for the relevant years was identical. The policy provided that “[a]ll premium[s] for this policy will be determined by the Workers’ Compensation Insurance Rating Bureau’s manuals of rules, rates, rating plans and classifications.”
 

 Schaefer alleged SCDF had misallocated and then misreported the insureds’ financial information to the Rating Bureau. In order to calculate the premium to be charged by SCDF to its insureds, the Rating Bureau considers a variety of factors, including what is known as the experience modification factor. This factor involves in part a comparison of the expected losses of all employers to the actual incurred losses plus reserve estimates of the insured employer at issue.
 

 SCIF forwards the financial information of its insureds to the Rating Bureau in unit statistical reports. Each report contains three columns: indemnity, medical, and defense expense or allocated loss expense. Only the financial information reported in the indemnity and medical expense columns, not in the defense expense column, is used by the Rating Bureau to compute an insured’s experience modification factor. Medical-legal reports requested by the employer or insurer that were not prepared by the attending physician are properly allocated as defense expenses. Nevertheless, SCIF either intentionally or negligently misreported such expenses as medical expenses to the Rating Bureau. Hence, the insureds’ experience modification
 
 *934
 
 factor was artificially inflated, which in turn allowed SCIF to collect excessive premiums.
 

 Schaefer further alleged that SCIF had a policy of “refusing to provide to its insuredfs] access to all individual claims files,” “refusing to provide its own insureds ... the ability to audit and/or monitor the manner in which SCIF has represented them in various workers’ compensation actions,” and “barring its own insureds . . . from having access to any information, including a showing of how Medical-Legal reports on workers’ compensation claims ... are reported to the WCIRB.” These policies were “designed by SCIF to prohibit insureds . . . from auditing, questioning, or in any manner attempting to determine whether SCIF performed reasonably in administering the claims of the insureds,” and “to prevent an insured from discovering SCIF’s intentional or negligent manipulation of the reserves” and “misreporting of financial information to the WCIRB.”
 

 In response to SCIF’s motion for summary judgment, the civil action was stayed for several years while Schaefer pursued its administrative remedies. On August 9, 1994, the Rating Bureau determined that SCIF had improperly reported expenses for nonattending physician reports requested by the employer or insurer as incurred medical, not defense, expenses. It stated, “expenses for medical-legal reports prior to January 1, 1993 . . . should (and could) only have fallen within the category of ‘Defense Expense’ for reporting under the Unit Statistical Plan, so long as they did not include expenses for actual medical ‘treatment.’ ” The Rating Bureau directed SCIF to submit revised unit statistical reports for Schaefer Ambulance Service, Inc., Sectran Security, Inc., and Universal Courier Limited for the years January 1, 1988 to January 1, 1989, January 1, 1988 to January 1, 1991, and December 31, 1987 to December 31, 1991, respectively.
 
 [3]
 

 SCIF appealed the Rating Bureau’s decision to the classification and rating committee of the Rating Bureau,, which on January 13, 1995, after further argument and briefing, upheld the bureau’s determination. SCIF then appealed the decision to the Insurance Commissioner. An evidentiary hearing was held in December 1995 before an administrative law judge, who received numerous documentary exhibits and heard two days’ testimony from the parties’ expert witnesses. On May 8, 1996, the administrative law judge issued a proposed decision affirming the Rating Bureau and stating, “The Bureau correctly determined that the Unit Statistical Plan provisions in
 
 *935
 
 effect from January 1, 1983, until January 1, 1993, require the costs of insurer-requested medical examination reports, provided by medical experts other than an attending physician, to be allocated as defense expenses in unit reports to the Bureau.” The Insurance Commissioner adopted the proposed decision on May 28, 1996. According to SCIF, on January 11, 1999, the commissioner made this determination binding on all workers’ compensation insurers.
 

 In September 1996, SCIF filed a petition for writ of mandate in the trial court to direct the commissioner to vacate his order. On March 16, 1999, the trial court denied the petition for writ of mandate and entered judgment in May 1999. In May 2000, the Court of Appeal affirmed.
 
 (State Comp. Ins. Fund v. Quackenbush
 
 (May 22, 2000, A087127) [nonpub. opn.].)
 

 On March 19, 1999, the civil action stay was lifted. In May 1999, SCIF moved for judgment on the pleadings on the ground that the action was barred by section 11758. The trial court denied the motion, and the Court of Appeal summarily denied SCIF’s ensuing petition for writ of mandate and immediate stay request. SCIF petitioned for review, and we issued an order to show cause why the relief sought in SCIF’s petition should not be granted.
 

 II. Discussion
 

 Section 11758, contained in article 3, chapter 3, part 3 of division 2 of the Insurance Code, the statute at issue in this case, provides: “No act done, action taken or agreement made pursuant to the authority conferred by this article shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance.” Former section 11750, which also appeared in article 3, provided, prior to its amendment in 1993: “The purpose of this article is to promote the public welfare by regulating concert of action between insurers in collecting and tabulating rating information and other data that may be helpful in the making of adequate minimum rates for workers’ compensation insurance and for employers liability insurance incidental thereto and written in connection therewith for all admitted insurers and in submitting them to the commissioner for issuance or approval; to authorize and regulate the existence and cooperation of qualified rating organizations to one of which each workers’ compensation insurer shall belong; to authorize and regulate cooperation between insurers, rating organizations and advisory organizations in rate making and other related matters to the end that the purposes of this chapter may be complied with and carried
 
 *936
 
 into effect.”
 
 [4]
 
 (Stats. 1981, ch. 714, § 298, p. 2712; see now, present § 11750 [substituting “pure premium rates” for “minimum rates,” changing “issuance or approval” to “approval” and changing spelling of “ratemating”].)
 

 Schaefer asserts that section 11758 grants immunity only for antitrust or concert of action claims, not claims that an insurer engaged in unilateral misconduct. Along these lines, it disagrees with SCIF that this is a ratemating case; rather it is simply a garden variety bad faith insurance dispute. SCIF contends this is a ratemating case, and that section 11758 bars all civil claims “arising from workers’ compensation rate-mating disputes, unless brought under a statute which specifically relates to insurance.” Since none of Schaefer’s claims are brought under such a statute, they are barred by section 11758. SCIF concedes, however, that Schaefer’s dispute with SCIF “relates to the alleged misreporting of ‘medical-legal’ costs, not the calculation of rates, experience modifications or premiums.”
 

 By its terms, section 11758 refers to an “act done, action taken or agreement made
 
 pursuant to the authority
 
 conferred by this article . . . .” (Italics added.) It does not refer to an “act done, action taken or agreement made pursuant to this article.” As relevant here, what is authorized by article 3 is “cooperation between insurers, rating organizations and advisory organizations in ratemating and other related matters to the end that the purposes of this chapter may be complied with and carried into effect.” (§ 11750.) Such price-setting activity would arguably otherwise be barred by the antitrust laws. Thus, in order for the miscalculating and misreporting of loss information to fall within the scope of section 11758’s immunity, it appears it must be related to such authorized cooperation in “ratemating and other related matters.” (§ 11750.)
 

 Arguably, an insurer’s act of reporting financial information to a rating organization is inextricably tied to the operation of a rating organization. That is, while the act of reporting (or misreporting) financial information is a unilateral act, it results in a rating organization receiving sufficient information from each insurer that it can set a minimum rate and appropriate premiums for each insured.
 

 Here, however, Schaefer does not contend the mere act of reporting financial information to the Rating Bureau was misconduct. In particular, Schaefer does not allege that SCIF violated any antitrust laws by reporting such information. Nor does it challenge the manner in which premiums or
 
 *937
 
 rates are set by the Rating Bureau. Rather, it disputes the manner in which SCIF analyzed and allocated Schaefer’s financial data prior to the data being sent to the Rating Bureau. The Rating Bureau presumably had no way of knowing, absent an audit, that medical reports of nonattending physicians were included in the reported figure for Schaefer’s medical expenses.
 

 Of course, Schaefer also alleges that SCIF misreported Schaefer’s medical expenses to the Rating Bureau, and this led to the imposition of excessive premiums. However, while not addressing section 11758, numerous Courts of Appeal decisions in other contexts have sanctioned civil claims against SCIF and other workers’ compensation insurers alleging that their misconduct resulted in unjustifiably higher premiums. In all of these cases, the insurer had to first report the misinformation to the Rating Bureau before the premiums could be affected.
 

 Thus, in
 
 Security Officers Service, Inc. v. State Compensation Ins. Fund
 
 (1993) 17 Cal.App.4th 887, 891 [21 Cal.Rptr.2d 653]
 
 {Security Officers
 
 Service), the insured employer alleged that SCIF’s misconduct, including its failing to promptly resolve claims and assigning excessive reserves for unresolved claims, increased plaintiff’s experience modification rating and caused its premiums to rise to unwarranted levels. While SCIF apparently did not raise section 11758 as a defense in that case, the court rejected SCIF’s tort immunity claim, and stated the “insurer may be liable if it processes claims and sets reserves without good faith regard for their impact on the insured’s premiums.”
 
 (Security Officers Service,
 
 at pp. 890, 892; see
 
 Notrica
 
 v.
 
 State Comp. Ins. Fund
 
 (1999) 70 Cal.App.4th 911, 921, 925, 956 [83 Cal.Rptr.2d 89] [reversing punitive damages award but otherwise affirming judgment against SCIF, including jury’s implicit finding SCIF had failed to estimate reasonable claim reserves, resulting in Notrica’s paying higher premiums and receiving lower dividends];
 
 MacGregor Yacht Corp.
 
 v.
 
 State Comp. Ins. Fund
 
 (1998) 63 Cal.App.4th 448, 453, 456-459 [74 Cal.Rptr.2d 473] [upholding trial court ruling that SCIF breached the implied covenant of good faith and fair dealing by improperly overestimating claims reserves and ineffectively investigating claims leading to higher experience modification factor and thus higher premiums];
 
 Lance Camper Manufacturing Corp.
 
 v.
 
 Republic Indemnity Co.
 
 (1996) 44 Cal.App.4th 194, 197, 203 [51 Cal.Rptr.2d 622] [insured challenging claims-handling practices that increased the insurer’s reported losses, which resulted in higher premiums, higher reserves, and lower dividends, could pursue breach of contract and implied covenant of good faith and fair dealing claims without exhausting administrative remedies];
 
 Tricor California, Inc. v. State Compensation Ins. Fund
 
 (1994) 30 Cal.App.4th 230, 233, 242 [35 Cal.Rptr.2d 550] [claim that SCIF engaged in bad faith in settling individual policy claims to artificially
 
 *938
 
 inflate its reserves and Tricor’s premiums, and deflate Tricor’s dividends was not a rate-setting dispute, and could be pursued as a civil claim without exhausting administrative remedies]; cf.
 
 New Plumbing Contractors, Inc.
 
 v.
 
 Nationwide Mutual Ins. Co.
 
 (1992) 7 Cal.App.4th 1088, 1091, 1092, 1094, 1097 [9 Cal.Rptr.2d 469] [employer that assigned its subrogation rights to its workers’- compensation insurer had no cause of action for negligence or breach of the implied covenant of good faith and fair dealing when carrier did not actively pursue those rights, leading to unrecoverable higher premiums, because nothing in the relevant statutes requires subrogation rights to be pursued in a particular manner, and insured was not complaining about receipt of policy benefits].)
 

 Given that premiums set for workers’ compensation policies are dependent in part on the financial information submitted by the insurer, insurer misconduct in handling the insured’s workers’ compensation claims or other financial information can always potentially result in higher premiums. If we were to extend section 11758’s immunity to the claims alleged in this case regarding analyzing and reporting financial information, liability for misconduct that resulted in higher premiums would arguably also be precluded in these other contexts. It is doubtful section 11758 intended to paint with so broad a brush. Indeed, section 11783, subdivision (a) expressly provides that SCIF may “[s]ue and be sued in all actions arising out of any act or omission in connection with its business or affairs.” Moreover, while Schaefer prevailed in the administrative proceedings, SCIF does not point to any authority allowing the Insurance Commissioner to order a carrier to refund all improperly collected premiums to the insured.
 

 Interpreting section 11758 to only apply to concerted activity otherwise barred by the antitrust laws, and not to the individual misconduct of an insurer regarding its insured, is also supported by section 11758’s legislative history. In 1944, the United States Supreme Court held that the insurance business constituted interstate commerce subject to Sherman Act antitrust prosecution for insurer conspiracy to fix premium rates and monopolize trade and commerce in certain insurance areas.
 
 (U.S. v. Underwriters Assn.
 
 (1944) 322 U.S. 533, 534-535, 550, 553, 561 [64 S.Ct. 1162, 1164, 1172, 1173-1174, 1178, 88 L.Ed. 1440] (South-Eastern).) Congress subsequently granted insurers a moratorium from the Sherman Act, Clayton Act, and Federal Trade Commission Act until June 30, 1948, at which time they would become applicable “to the extent that [the insurance] business is not regulated by State law.” (15 U.S.C. § 1012(b).) In response, the California Legislature enacted the McBride-Grunsky Insurance Regulatory Act of
 
 *939
 
 1947. This act included section 1860.1,
 
 [5]
 
 which has language virtually identical to section 11758.
 

 In a letter to Governor Warren, Deputy Insurance Commissioner Maloney stated, “It is generally conceded that concert of action in the making of insurance rates is not only desirable but necessary by reason of the very nature of insurance. Accordingly, to prevent the application of the Federal Anti-trust Laws to this necessary activity in the insurance field of interstate commerce it is essential that state legislation be enacted to affirmatively authorize such concert of action in the making of insurance rates to the extent consistent with the public interest and to regulate such concert of action.” (State Deputy Ins. Comr. John R. Maloney, letter to Governor Earl Warren re Sen. Bill No. 1572 (1947 Reg. Sess.) June 10, 1947, pp. 1-2; Joint Interim Legis. Com., Rep. on Ins. Reg., 1 Sen. J. Appen. (1947 Reg. Sess.) p. 5 [“All concerned agreed that the business of insurance was unusual in that it required concert of action among insurance carriers so that adequate statistical information would be available upon which to promulgate rates. As a practical matter the business of insurance cannot be conducted and maintained upon a sound basis unless insurance carriers discuss and pool their experience for rate making purposes. One of the problems, then, was to adopt a regulatory law which would permit this collection of data which is unquestionably in the public interest and at the same time prevent the growth of monopolistic practices which would adversely affect the public”]; see
 
 Galanty
 
 v.
 
 Paul Revere Life Ins. Co.
 
 (2000) 23 Cal.4th 368, 381, fn. 24 [97 Cal.Rptr.2d 67, 1 P.3d 658].)
 

 In 1951, the Legislature enacted article 3, including section 11758. (Stats. 1951, ch. 1123, § 1, pp. 2879, 2887.) The legislative history includes a letter stating: “Because Workmen’s Compensation rates are not subject to the McBride-Grunsky Insurance Regulatory Act of 1947 (Insurance Code Sections 1850 to 1860.3), there is a question of whether or not Workmen’s Compensation insurers thus working in concert in connection with rates may not be subject to Federal regulation. Under Federal law, this Federal regulation, with certain very minor exceptions, would not apply if the subject matter is adequately covered by State law. The principal purpose and effect of Senate Bill 928 is to achieve this State regulation. The new article very largely parallels the provisions of the [McBride-Grunsky Insurance Regulatory Act], . . . This bill applies much the same language to Workmen’s Compensation Insurance specifically.” (Ins. Comr. John R. Maloney, letter
 
 *940
 
 to Governor Earl Warren re Sen. Bill No. 928 (1951 Reg. Sess.) June 8, 1951, p. 1.)
 

 In addition, the Department of Insurance, the government agency charged with enforcing the state’s insurance laws, recently wrote to this court in an unrelated case. The Insurance Commissioner expressed the view, “The purpose of [Insurance Code section 11758] is to immunize insurers and rating organizations from anti-trust laws so that they can act in concert to make rates. It has long been considered necessary to allow the insurance industry an exemption from the laws that prohibit other industries from actions done in concert that affect the price of their products. The extraordinary grant of immunity from prosecution or civil proceedings in Section 11758 must be seen in context—as a recognition of the unique status of the insurance industry within the framework of federal and state anti-trust law. That immunity is for the purpose of acting in concert pursuant to the authority granted by Article 3. ... HQ ... HQ .. . The plain language of Insurance .Code Section 11758 does not immunize an insurer from misconduct in reporting data to the rating organization. Furthermore, the legislative history of that statute indicates that it was intended to allow insurers to act in concert to make rates. The action of a single insurer in reporting data that is eventually used to make rates is not the same as a concert of action among entities in order to make rates.” (Ins. Comr. Charles Quackenbush, letter to Chief Justice Ronald M. George, May 12, 1999, pp. 1-2.) While this court is the final arbiter of what section 11758 means, the Insurance Commissioner’s interpretation is entitled to “ ‘some consideration.’ ”
 
 (Yamaha Corp. of America v. State Bd. of Equalization
 
 (1998) 19 Cal.4th 1, 11, 15 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)
 

 SCIF asserts that while “potential antitrust liability obviously was a significant impetus to states when enacting insurance regulations,” the provisions of both the McBride-Grunsky Insurance Regulatory Act and article 3 were adopted to ensure that all aspects of the insurance business, such as premiums, taxation, and antitrust were regulated by the state, not federal, government. Hence, SCIF argues, section 11758’s immunity should be broadly interpreted.
 

 Of course, permitting liability here does not remove SCIF from state regulation. More importantly, none of the legislative history relied on by SClF demonstrates that section 11758 is to be so broadly construed.
 

 SCIF also relies on
 
 Bums v. State Compensation Ins. Fund
 
 (1968) 265 Cal.App.2d 98 [71 Cal.Rptr. 326]
 
 (Bums).
 
 In
 
 Bums,
 
 the plaintiff employee was injured and received workers’ compensation benefits.
 
 (Id.
 
 at p. 100.)
 
 *941
 
 The employee then sued his employer’s insurer, SCIF, and the California Inspection Rating Bureau, the predecessor to the current Rating Bureau.
 
 (Ibid.)
 
 He alleged SCIF and the Inspection Rating Bureau breached their agreement with his employer to carefully inspect the work premises, and he was injured as a result.
 
 (Ibid.)
 
 The Court of Appeal concluded the action against SCIF was barred by the exclusivity of the workers’ compensation remedy.
 
 (Id.
 
 at pp. 101-102.)
 

 As for the action against the Inspection Rating Bureau, the court observed section 11750.3, subdivision (d) provided that a rating bureau may be organized and maintained for certain purposes, including “ ‘[t]o inspect risks for classification or rate purposes . . . .’ ”
 
 (Burns, supra,
 
 265 Cal.App.2d at p. 103.) In light of this express authorization to inspect, the court concluded that the Inspection Rating Bureau was immune under section 11758 for any negligence in connection with such inspections.
 
 (Burns,
 
 at p. 103.) The court noted that the Legislature had recently enacted section 11759, which expressly exempted the Inspection Rating Bureau from liability.
 
 (Bums,
 
 at p. 103.) However, that section was not effective at the relevant time of the action.
 
 (Ibid.)
 

 As noted above, the, stated purpose of article 3 is “to authorize and regulate the existence and cooperation of qualified rating organizations” and “to authorize and regulate cooperation between insurers, rating organizations and advisory organizations in ratemaking and other related matters . . . .” (§ 11750.) After
 
 South-Eastern, supra,
 
 322 U.S. 533, it appears the propriety of such rating organizations was in question. To the extent inspections are a necessary part of the Rating Bureau’s risk evaluation in ratemaking and involve cooperation with and amongst insurers, it is arguable that section 11758 does act to immunize the Rating Bureau from civil liability. But, even assuming
 
 Bums
 
 was correctly decided, it does not support the argument that section 11758 applies to an individual carrier’s unilateral conduct.
 

 SCIF also relies on
 
 Karlin
 
 v.
 
 Zalta
 
 (1984) 154 Cal.App.3d 953 [201 Cal.Rptr. 379], called into doubt by
 
 Manufacturers Life Ins. Co.
 
 v.
 
 Superior Court
 
 (1995) 10 Cal.4th 257, 263, 278-279 [41 Cal.Rptr.2d 220, 895 P.2d 56], in which the court concluded an antitrust action directed at charged premium rates, and alleging violations of the Unfair Practices Act (§ 790 et seq.), was barred by section 1860.1.
 
 (Karlin,
 
 at pp. 963-964, 972, 974.) However, unlike the claim in
 
 Karlin,
 
 Schaefer’s claim has no antitrust implications.
 

 Finally, SCIF relies on
 
 Walker v. Allstate Indemnity Co.
 
 (2000) 77 Cal.App.4th 750 [92 Cal.Rptr.2d 132], In
 
 Walker,
 
 the plaintiffs sued over 70
 
 *942
 
 insurers seeking damages or disgorgement of allegedly excessive premiums the insurers had been authorized to collect since 1994.
 
 (Id.
 
 at p. 752.) “The causes of action were each bottomed on the insurers charging approved rates alleged nevertheless to be ‘excessive.’ ”
 
 (Id.
 
 at p. 753.) The Court of Appeal held the action was barred by section 1860.1.
 
 (Walker,
 
 at p. 756 [“If section 1860.1 has any meaning whatsoever ... the section must bar claims based upon an insurer’s charging a rate that has been approved by the commissioner”].) The court noted that the statutory scheme enacted by the voters in Proposition 103 was elaborate and involved extensive hearings and consumer and interested party participation. “Interested parties may seek judicial review of the commissioner’s decision by filing a timely petition for writ of administrative mandamus,” which the parties here had not done.
 
 (Walker,
 
 at pp. 753-754, 756.) Rather, they were attempting to challenge, years later in a civil action, the method by which the rates were set, arguing that the “rates were approved without compliance with the ‘generic factors regulations,’ ” rendering them “ ‘illegal and void.’ ”
 
 (Ibid.)
 
 Here, of course, Schaefer does not challenge the method by which the rate or premium charged was set, but rather the insurer’s misallocation of certain expenses.
 

 Schaefer asserts that SCIF’s reporting obligation to the Rating Bureau arises under former article 2, not article 3, and hence section 11758’s immunity provision is inapplicable. SClF asserts that the obligation arises exclusively under article 3, and even if it does not, section 11758 applies to conduct arising under either former article 2 or article 3. Our review indicates that both articles (as they existed at the relevant time) touched on this requirement; at a minimum it is apparent the reporting requirement was at least addressed in article 3. For example, the 1983 unit statistical plan expressly states that it was issued in accordance with articles 2 and 3. Section 11755, contained in article 3, provides, “No person, insurer, rating or advisory organization shall willfully withhold information from, or knowingly give false or misleading information to, the commissioner or to any rating organization, which will affect . . . premiums for workers’ compensation insurance and employer’s liability insurance incidental thereto . . . .” Section 11751.5, which is also in article 3, provides, “The commissioner . . . may promulgate reasonable rules and statistical plans, . . . which shall be used thereafter in the recording and reporting by insurers of their loss and expense experience in order that the experiences of all insurers may be made available ... to aid the commissioner in administering the provisions of Article 2 . . . .” Former article 2, which was repealed in 1993 (Stats. 1993, ch. 228, § 1, p. 1793), on the other hand, authorizes the Insurance Commissioner to establish an experience rating system. (Former § 11730, Stats. 1981, ch. 714, § 290, p. 2711; former § 11732, Stats. 1977, ch. 459, § 2, p. 1514; see also former § 11737, Stats. 1935, ch. 145, § 11737, p. 723.)
 
 *943
 
 Moreover, former section 11740, contained in former article 2, provided, “The commissioner may require every insurer issuing workers’ compensation insurance ... to file with its annual statement a sworn report of its loss experience . . . .” (Stats. 1981, ch. 714, § 295, p. 2712.)
 

 To the extent either party relies on statutes enacted or amended in 1993, and effective in 1995, they are not relevant to the time period at issue here. Even if they were applicable, a review of these statutes indicates that the reporting obligation is now clearly referenced in both articles. (See §§ 11734, subd. (b) [art. 2: “Every workers’ compensation insurer shall record and report its workers’ compensation experience to the designated rating organization”], 11751.8 [art. 3: describing when “[a]n insurer shall report to its rating organization . . . corrections or revisions of losses”].)
 

 We are cognizant of the fact that the calculation of insurance premiums and interpretation of SCIF’s reporting requirements as contained in the 1983 unit statistical plan is best suited to the administrative process. Here, however, the administrative process has run its course, and we enjoy the benefit of that expertise. In particular, at every level SCIF has been found to have committed malfeasance. Moreover, the formula by which premiums are determined, while complicated, is set by law and is public information, and hence the premium Schaefer should have been charged is capable of calculation by experts in a trial court. (See
 
 MacGregor Yacht Corp. v. State Comp. Ins. Fund, supra,
 
 63 Cal.App.4th at pp. 459-460 [trial expert used the same formula as Rating Bureau “to recalculate MacGregor’s experience modifier, as it would have been had SCIF’s reserves been reasonable . . . [and] the same formulas used by the insurance industry to calculate workers’ compensation insurance premiums,” and “SCIF presented no evidence controverting the actuary’s analysis”].) Indeed, the Rating Bureau may have already partially performed this task. Thus, contrary to SCIF’s assertion, by allowing this suit to proceed, we will not be asking the trial court to struggle with an issue it cannot resolve.
 

 In addition, SCIF argues that the workers’ compensation system is intended to be implemented outside the civil court system to maintain its efficient and prompt disposition of workers’ claims. Here, however, the dispute is between an insured employer and its insurer, and while it arises in the workers’ compensation context, it is in practical effect no different from any other dispute between such parties. SCIF does not attempt to demonstrate the allegations here fall within the scope of the workers’ compensation exclusive remedy provisions. (See generally
 
 Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund
 
 (2001) 24 Cal.4th 800, 810-812 [102 Cal.Rptr.2d 562, 14 P.3d 234].)
 

 
 *944
 
 We emphasize that in reaching this result we are not asked to and do not reach any conclusion as to whether Schaefer has stated a valid cause of action against SCIF. We merely determine whether a civil suit based on Schaefer’s allegations is precluded by section 11758’s immunity. For the reasons set forth above, we conclude it is not.
 

 Disposition
 

 The judgment of the Court of Appeal summarily denying the petition for writ of mandate is affirmed and the order to show cause issued November 10, 1999, is discharged.
 

 George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., and Chin, J., concurred.
 

 Petitioner’s petition for a rehearing was denied March 21, 2001.
 

 [1]
 

 All statutory references are to the Insurance Code unless otherwise indicated.
 

 [2]
 

 Following a substantial overhaul of the workers’ compensation laws in 1993, an insurer may now charge any premium that does not tend to impair or threaten its solvency or tend to create a monopoly. (§ 11737, subd. (b).)
 

 [3]
 

 These periods of time differ from the civil complaint, which alleges misconduct beginning in 1984. This was apparently because the Rating Bureau’s review was limited to written requests received within 12 months after the expiration date of the policy in question.
 

 [4]
 

 We agree with SCIF that article 3 authorizes more than insurers acting in concert, such as providing for certain powers of the Insurance Commissioner. However, the authorization to act in concert is the only relevant authority pertaining to insurers.
 

 [5]
 

 Section 1860.1 provided: “No act done, action taken or agreement made pursuant to the authority conferred by this chapter shall constitute a violation of or grounds'for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance.”