119 Cal.Rptr.2d 660 (2002)
98 Cal.App.4th 434
JONATHAN NEIL & ASSOCIATES, INC., Plaintiff and Appellant,
v.
Freddie JONES, Defendant, Cross-Complainant and Appellant;
Mildred Jones et al., Cross-Complainants and Appellants.
Cal-Eagle Insurance Company, Cross-Defendant and Appellant;
Johnsey Insurance Company, Cross-Defendant and Respondent.
Nos. F029400, F030300.
Court of Appeal, Fifth District.
May 14, 2002.
Rehearing Denied May 31, 2002.
Review Granted August 14, 2002.
*661 Fried, Frank, Harris, Shriver & Jacobson, Richard A. Brown and E. Randol Schoenberg; Greines, Martin, Stein & Richland, Irving H. Greines, Robin Meadow, Beverly Hills, Tyna Thall Orren, Pasadena, and Peter 0. Israel, Beverly Hills, for Plaintiff and Appellant and Cross-defendant and Appellant.
McCormick, Barstow, Sheppard, Wayte & Carruth, James P. Wagoner, Fresno, and Wendy S. Loyd, for Defendant, Cross-complainant and Appellant Freddie Jones and Cross-complainants and Appellants Mildred Jones and Fred Jones Trucking, Inc.
Emerson, Corey & Barsotti, Fresno, for Cross-defendant and Respondent.
Certified for Partial Publication[*]

OPINION
VARTABEDIAN, Acting P.J.
This appeal and cross-appeal follow a judgment in favor of a trucking company and its owners, and against the company's assigned-risk liability insurer. We find the facts do not support a tort cause of action for breach of the duty of good faith and fair dealing and that the trial court erred when it failed to stay proceedings while the parties exhausted administrative remedies before the Insurance Commissioner. As a result of these conclusions, the judgment must be reversed and the matter remanded for further proceedings.

*662 FACTS AND PROCEDURAL HISTORY

The Trucking Company and Its Liability Insurance
In 1990 and 1991, Freddie and Mildred Jones owned a trucking company, known as Fred Jones Trucking. In August of 1992, the Joneses formed a corporation, Fred Jones Trucking, Inc., and assigned to it all of their interest in Fred Jones Trucking. We will refer to the Joneses' individual and corporate identities as "the Joneses," unless the particular context requires a further distinction. The Joneses operated under the authority of the California Public Utilities Commission (PUC).[1] They performed both contract and job-lot hauling consisting mostly of day trips of less than 200 miles.
The Joneses owned two tractor units and five trailers. Of their gross receipts of about $680,000 per year in 1991, about $365,000 was paid to subhaulers. Subhaulers are individual owner-operators who have their own PUC certificates of authority and their own liability insurance, required as a condition of certification by the PUC.
The PUC also requires the insurer of any regulated trucker to cover any injury or damage to third parties caused by any PUC-regulated vehicle used in the trucker's business, although this coverage permits the insurer to seek reimbursement from its insured if the risks have not been disclosed to the insurer. Thus, because the Joneses were themselves holders of a PUC certificate for their trucking company and subhaulers held their own certificates, two insurance companies could be responsible for payment if a subhauler had an accident while hauling for the Joneses.
The Joneses had liability insurance for the 1990 policy year with Edison Insurance. Edison went out of business and the Joneses needed to find a new insurer. Their insurance agent, Johnsey Insurance Company (Johnsey), suggested they obtain insurance through the state's assigned risk plan because it might save the Joneses some money. The Joneses agreed.
Johnsey obtained an application for the assigned risk plan. The application contained a statement to the effect that any policy issued as a result of the application would be subject to the rules and regulations of the assigned risk program: "This application shall be evidence of temporary insurance subject to the following conditions: [¶].... [¶] 4. The insurance afforded hereunder shall be subject to all the terms and conditions of the Plan and of the policy form prescribed for use."
The Joneses' application was assigned to Cal-Eagle Insurance Company (Cal-Eagle) by the assigned-risk program office. Cal-Eagle issued a policy in a form required by the Department of Insurance. It charged the Joneses an initial estimated annual premium of $14,088, based on the Joneses' use of their own, specified vehicles in the business. (Cal-Eagle added the minimum permissible premium of $299 for the PUC endorsement coverage, based on the information set out in the Joneses' application.) Over the term of the policy, Cal-Eagle assessed additional premiums as the Joneses added equipment to their fleet. The total of premiums charged and paid during the policy year was $21,752.
The Cal-Eagle policy issued to the Joneses included the following language:

"1. Premium Changes

*663 "The premium for this policy is based on information we have received from you or other sources. You agree:
"a. that if any of this information material to the development of the policy premium is incorrect, incomplete or changed, we may adjust the premium accordingly during the policy period,
"b. to cooperate with us in determining if this information is correct and complete, and to advise us of changes in this information.
"Any adjustment of your premium will be made using the rules in effect at the time of the change. Premium adjustment may be made as a result of a change in:
"a. autos insured by the policy ....
"b. drivers, driver's age or driver's marital status.
"c. coverages or coverage limits.
"d. rating territory.
"e. eligibility for discounts or other premium credits."
After the policy expired, Cal-Eagle did a routine audit of the Joneses to make sure all of the vehicles used in the business had been accounted for in the calculation of premiums. The audit took place pursuant to the following provision of the policy: "The estimated premium for this Coverage Form is based on the exposures you told us you would have when this policy began. We will compute the final premium due when we determine your actual exposures."
The auditor discovered the Joneses' extensive use of subhaulers, and Cal-Eagle assessed the Joneses (under old Rule 23 of the California Commercial Automobile Assigned Risk Plan Manual of Rules and Rates, explained below) another $111,523 in insurance premiums for the coverage period that had just expired. This additional premium was subsequently adjusted to $51,294 under new Rule 23, also explained below.
The Joneses declined to pay the additional premium. Cal-Eagle assigned its claim to Jonathan Neil & Associates, Inc., a collection agency, which sued Freddie Jones for the balance due on the premium. The Joneses responded with a cross-complaint, initially for bad faith and subsequently amended to state other tort causes of action.

The Commercial Automobile Insurance Procedure (CAIP)

The Basic Assigned Risk Program
Section 11620 of the Insurance Code requires the Insurance Commissioner to "approve or issue a reasonable plan" to provide liability insurance for those "who are in good faith entitled to but are unable to procure that insurance through ordinary methods." In general, the plan assigns such insureds to the various companies who write insurance in California and regulates the premiums that can be charged to such insureds. This assigned-risk insurance is generally issued at the minimal levels required by the financial responsibility law. (See Ins.Code, § 11622.)
Prior to adoption by referendum in 1988 of Proposition 103, the assigned risk plan was operated by a governing committee formed by the insurers, "subject to review by the Insurance Commissioner." (See former Ins.Code, § 11623, amended by Stats.1990, ch. 1132, § 1.) This committee is known as the CAARP committee, an acronym reflecting the name of the program it administers, the California Automobile Assigned Risk Program.
After 1990, the CAARP committee became advisory to the Insurance Commissioner (see Ins.Code, § 11623, subd. (a)). The Insurance Commissioner is required to "consult with the advisory committee on a regular basis on policy matters affecting the operation of the plan." (Ins.Code, *664 § 11623, subd. (a).) Nevertheless, the committee "with the approval of the commissioner shall appoint a manager to carry out the purposes of this article, employ sufficient personnel to provide services necessary to the operation of the plan, and contract for the provision of statistical and actuarial services." (Ibid.) The CAARP committee apparently has contracted with an organization called AIPSO to manage the plan. AIPSO is a nationwide operator of such plans; AIPSO provides policy and endorsement forms, as well as interpretive advice.
The CAARP committee is, by statute, composed of eight employees of insurance companies that write assigned-risk policies, four public members, two representatives of insurance agencies, and the Insurance Commissioner or his/her designee. (Ins.Code, § 11623, subd.(a).) Curiously, "[notwithstanding this act, which changes the status of the governing committee to that of an advisory committee, the committee shall have the right to retain counsel of its choice .... and the right and necessary standing to bring and defend actions in judicial and administrative proceedings related to the plan in the name of the plan. ..." (Ins.Code, § 11623, subd. (b).)
The Commercial Assigned Risk Procedure.
There are certain classes of vehicle users whose financial exposure (and potential danger to the public) is much greater than is contemplated by the ordinary assigned-risk placement. Among these is the class of commercial truckers. In order to accommodate these higher risk vehicle users, the Insurance Commissioner in 1978 promulgated (by regulation at Cal.Code Regs., tit. 10, § 2432 et seq.) the Commercial Automobile Insurance Procedure (CAIP). The assigned risk plan for truckers is also administered by the CAARP committee (of which there is a separate CAIP subcommittee that handles policy issues arising from truckers' insurance).
CAARP hires two "servicing carriers" (Cal.Code Regs., tit. 10, § 2432, subd. (e)), who provide all of the insurance policies issued under CAIP. These carriers have a contract with CAARP by which they are paid a percentage of the premium as a fee for their services. They turn all premiums over to CAARP and charge all claims to CAARP, which then distributes the charges among automobile liability carriers in California. Thus, the servicing carriers are not typical insurance companies in the sense of a company putting its own assets at risk through its underwriting and premium practices. Instead, risk is borne by the insurance industry at large, underwriting and premium practices are specified by CAARP and the Department of Insurance (DOI), and the servicing carrier is paid a commission for implementing and administering the program.
Cal-Eagle became one of the servicing carriers on March 6, 1991, and it issued the Joneses a one-year policy for a term beginning March 27,1991.

Rule 23.
CAARP and DOI promulgated a "California Commercial Automobile Assigned Risk Plan Manual of Rules and Rates" for servicing carriers' use in determining premiums and otherwise administering the commercial assigned-risk plan. Of primary importance in the present case is rule 23, in both its original form and as revised by DOI in 1992.
There was testimony to the effect that the manual was created by AIPSO, the national organization that CAARP had hired to manage CAIP. The testimony indicated that California was somewhat unique in issuing PUC certificates directly to subhaulers, with the attendant requirement *665 that the subhauler have its own insurance. In other states, according to the testimony, only the primary trucking company had insurance and the hired carriers were covered under that insurance. In its original form, California rule 23 was the generic, nationwide rule published by AIPSO. Because of the unique requirement that subhaulers have their own insurance, there had long been controversy and uncertainty concerning the way rule 23 applied in Californiaif it applied at all. At the very least, it can be said that the original rule 23 did not, in its language, take account of the California situation.
The provision relevant to the present discussion is subdivision C of rule 23 as it existed during the term of the insurance policy and the initial audit. Subdivision C, written in the form of a directive to the servicing carriers, stated in an initial, unnumbered paragraph: "Premium Determination: Rate automobiles transporting exclusively for one concern on the same basis as though owned by such concern for both territory and classification."
The rule then provided two alternatives. In subparagraph 1, the rule said truckers may be "written on a specified car basis according to the Trucks, Tractors and Trailers Classifications Rule." The Classifications Rule, rule 22, provided the basis on which Cal-Eagle calculated the premiums for the trucks and trailers owned and operated by the Joneses directly. If Cal-Eagle had applied this portion of the rule to the Joneses' subhaulers, it would have resulted in a listing in the Joneses' policy of each tractor and trailer used by any of their subhaulersand assessment of the full rated premium for each truck.
Rule 23 provided an alternative: "2. Cost of Hire Basis. Truckers may be written on the cost of hire basis to cover their liability because of a contract involving the hire of trucks, tractors and trailers." In order to determine the premium on this basis, the servicing carrier was required to first determine the average premium for listed tractors and trailers under the policy (as determined from application of rule 22), then multiply that average rate by .0033 to obtain the "cost of hire rate." The servicing carrier was then to determine the insured's total cost of hiring the subhaulers and compute the insurance premium by "multiplying each $100 of the total amount estimated for the cost of hire .... by the cost of hire rate." Nowhere in the rule was the word "subhauler" used; the relevant portion of the rule referred only to a "contract involving the hire of trucks, tractors and trailers."
Rule 23 was rewritten by DOI after a two-year period of study and consultation with the insurance industry. The revised rule specifically applied to exposure based on a "subhauling agreement involving the hauling of goods on behalf of an insured trucker by a hired carrier."
The revised rule recognized that in some circumstances the primary trucker's insurance would be called upon only to provide excess coverage if a claim exceeded the limits of liability of the subhauler's insurance. Thus, the revised rule stated at subparagraph C.2.a(2): "The insured trucker may request and the CAIP Servicing Carrier shall provide coverage for the hired carrier exposure on an excess basis where an insured trucker demonstrates at the time of application or upon renewal that all of the following criteria are satisfied and such criteria remain satisfied throughout the policy period[.]" The five criteria address both the form and the substance of the relationship between the trucker and the subhauler; the criteria are *666 set forth in the margin.[2] The premium applicable if the insured trucker is able to satisfy all criteria is 4 percent of the otherwise-applicable premium.
The revised rule also modified the otherwise-applicable premium. Although the premium was based on cost of hiring the subhaulers, as had been the premium under the original rule 23, the base multiplier was reduced from .0033 to .0011. The revised rule required that "the total cost of hiring" was to be calculated on the basis that each subhauler's vehicle was hired for a minimum of $60,000 of work per year.
As the revised rule was implemented from September of 1992 forward, certain problems revealed themselves. Some of the problems occurred because DOI required the carriers to implement the rule on a retroactive basis if requested by insureds. Most insuredsincluding the Jonesesdid not have the detailed records readily available to satisfy the five criteria for excess coverage. Further, smaller truckers like the Joneses did not use any particular subhauler for anywhere near $60,000 of work per year.
Through oral and written interpretations, written instruction letters in particular cases, and written directives, DOI over time shaped the application of the rule to try to achieve a fair and reasonable premium commensurate with the risks against which CAIP insured. In particular, DOI eventually decided substantial compliance with the five criteria was sufficient to permit reduction of the premium to the excess-insurance rate and it decided that the minimum charge per subhauler should be prorated on a daily basis.
The evidence was conflicting concerning when and how DOI implemented the postrevision interpretations of rule 23.

The Insurance Application Form
The application for assigned-risk insurance filed by the Joneses was a form specified *667 by DOI and made available to insurance agents. There was a section in which the applicant listed all "operators that usually drive" specifically insured vehicles and a section in which the applicant provided detailed information concerning all tractors and trailers covered by the policy.
Another section entitled "HIRED CAR COVERAGE" said, "Check here if desired. Cost of Hire Section must be completed." This section of the application inquired whether the Joneses used in their business nonowned vehicles that would be covered under the PUC endorsement. The Joneses, through their insurance agent, checked the box desiring such coverage and entered "-0-" in a box headed "Estimated Annual Cost of Hire."
The next page of the application had a section called "Cost of Hire," containing two subparts. Part (i) was for automobiles (including trucks) "leased or hired on a long term basis (over 6 mos.)." Such vehicles (which the Joneses did not utilize) were required to be "specifically insured .... as an owned automobile." Part (ii), critical to the parties' approach to the present case, required the following of the applicant: "Indicate the total Cost of Hire including wages, for automobiles, which are not specifically insured by the applicant as an owned automobile." This is referred to as "short term cost of hire." The application contained blanks for insertion of the cost of hire for the current year and the first through fourth prior years. The Joneses left this section of the application completely blank.
The Joneses spent some $360,000 each year on subhaulers. If these subhaulers were considered "hired cars," the relevant figures for the current and prior years should have been entered in the "short term cost of hire" section. Cal-Eagle would have been entitled to assess an estimated premium for this coverage based on the formula in rule 23, and it would have established the actual premium through an audit of or report by the insured at the end of the policy term.
Interpreting the applicability of rule 23 to the premiums that could be assessed for the use of subhaulers and the relationship between the language of the application form and rule 23, the trial court concluded: "[T]he Joneses' subhaulers are not within the cost of hire provision because the subhaulers' trucks are not hired vehicles." The next day, the court explained this ruling further: "[I]n spite of all the testimony and the possible ambiguities and conflicting arguments subhaulers aren't within the cost of hire provision.....[¶] Cost of hire is a word of art I guess by this time in the insurance industry and so is a hiredthe term hiredthe hire of autos another word of art or term of art, and I concluded that neither of those terms include subhaulers." In instructions to the jury, the court stated: "Subhaulers' trucks are not hired vehicles for the purpose of this action...."

The Bureaucratic Players
Although the statute provides that CAARP will directly operate the plan, and although Cal-Eagle's contract nominally was with CAARP, DOI (on behalf of the Insurance Commissioner) also considered itself to have direct supervisory authority over the servicing carriers, including Cal-Eagle. The servicing carrier contract between Cal-Eagle and CAARP provided that Cal-Eagle will "comply .... with all written bulletins, directives or interpretations [of the Procedures] issued by the Commissioner...." Nevertheless, DOI personnel testified they had authority under the contract to direct that Cal-Eagle take specific actions. Further, they testified, at one point, DOI threatened to cancel Cal-Eagle's servicing carrier contract.
*668 Former and current DOI employees testified that the department, in its normal role of regulator of the insurance industry, maintains a consumer complaint office. That office has the power to seek resolution of complaints and to institute administrative enforcement proceedings if informal resolution is not possible. DOI has administrative hearing officers and an appeal process.
Additionally, former and current DOI employees testified CAARP has an appeal process specific to assigned risk insureds. The committee has the authority to hold hearings and issue decisions, which are subject to review by the Insurance Commissioner. On occasion, CAARP referred complaints to DOI for initial hearing.
The Joneses filed a complaint with the DOI consumer affairs office after Cal-Eagle issued the adjusted bill for $51,000, complaining that Cal-Eagle demanded too many records. DOI responded that Cal-Eagle was correct to ask for these records and that the Joneses should try to provide them. DOI invited the Joneses to recontact DOI if, upon providing the records, they got no relief from Cal-Eagle. (In its response to DOI inquiries investigating the Joneses' complaint, Cal-Eagle failed to disclose that the Joneses already had asked for extra time to "recreate" the necessary records, and that Cal-Eagle's auditor had refused on the basis that the audit had to review only the records "now in existence.") The Joneses did not pursue the matter through DOI.
Although Cal-Eagle had a general policy to inform its insureds about administrative appeals through CAARP, it did not inform the Joneses about the availability of such an appeal when the Joneses' insurance agent and their lawyers complained to Cal-Eagle about the additional premium. The Joneses did not file an appeal with CAARP.

Proceedings in the Trial Court
Cal-Eagle moved for summary judgment on two bases: that the Joneses failed to state a tort cause of action for bad faith and that they had failed to exhaust their administrative remedies. The trial court denied the motion. Cal-Eagle petitioned this court for writ relief. This court summarily denied the petition.
The trial was divided into three phases. Phase I was a trial to the court without a jury on certain matters of interpretation of statutes, regulations, rules, and policy language. Phase II was the trial to the jury of the complaint and cross-complaint. Phase III was the trial to the jury concerning the amount of punitive damages to be awarded. The jury found the Joneses owed no additional premiums on Jonathan Neil's complaint, awarded the Joneses $2,027,167 in compensatory damages from Cal-Eagle and assessed punitive damages against Cal-Eagle in the amount of $11,445,714.23. In posttrial proceedings the trial court conditioned its denial of a new trial motion on remittitur of the punitive damages award to $4,350,887. While preserving their right to cross-appeal, the Joneses consented to the remittitur.
Cal-Eagle and Jonathan Neil & Associates, Inc. filed timely notices of appeal, as did the Joneses. Cal-Eagle and Jonathan Neil & Associates, Inc. subsequently filed a notice of appeal from the order on costs (F030300); that appeal was consolidated with this case by order of the court.

DISCUSSION
Cal-Eagle's appeal raises issues of jurisdiction and standing, failure to state a cause of action, trial and instructional error, and substantive issues concerning the award of damages and attorney fees. The Joneses' cross-appeal challenges the trial *669 court's reduction of the jury's punitive damages award, certain substantive and evidentiary rulings during the trial, and certain rulings concerning attorney fees.
We conclude the trial court committed two fundamental errors that require reversal of the judgment. As a result of our holdings on these two issues, any retrial of this matter will have a wholly different texture and many or most of the substantive and procedural issues raised by the parties will not recur on retrial. Accordingly, we have addressed only the issues we consider dispositive of this appeal. Those issues are whether the Joneses have stated a tort cause of action for bad faith and whether judicial consideration of this case is precluded by the doctrine of exhaustion of administrative remedies.

I.

The Facts of this Case Do Not Support a Tort Cause of Action for Bad Faith.
After Cal-Eagle's motion for summary judgment was denied, it filed a petition for writ of mandate in this court. In addition to the exhaustion of remedies issue, the petition contended the Joneses had failed to state a tort cause of action for insurance bad faith. This court summarily denied the writ.
On this appeal from the judgment, Cal-Eagle does not renew, in the same terms, the argument that the Joneses failed to state a tort cause of action for bad faith. Instead, it raises the issue in the context of instructional error: "The trial court instructed the jury that incorrect billing statements may deprive an insured of an insurance `benefit' and may breach the covenant of good faith and fair dealing. .... This was prejudicial error." (Record citation and fn. omitted.) We perceive this as essentially the same argument raised in the writ petition.
The Joneses perceive the argument in the same manner. In response, they state: "a number of decisions have confirmed that a claim for breach of the covenant of good faith and fair dealing may be predicated solely on the insurer's conduct causing a higher premium." In a footnote, they list seven cases and state: "This same conclusion was presumably reached by this court in denying Cal-EagleS's Petition for Writ of Mandate...."
The Joneses' presumption is incorrect. Our summary denial of the writ petition was neither an adjudication of the issues nor did it reflect any view of this court concerning the issues presented. (See Kowis v. Howard (1992) 3 Cal.4th 888, 897, 12 Cal.Rptr.2d 728, 838 P.2d 250.) In considering the issue for the first time on this appeal, we conclude the circumstances of the present case do not give rise to a tort cause of action for insurance bad faith.
The common-law tort of breach of the duty of good faith and fair dealing has a venerable history in California, but that doctrine has enjoyed relatively broader and narrower application over the years. The cases finally appear to have settled on a relatively narrow application of the doctrine; as a result, earlier cases that contain dicta that might support the expansion of the doctrine as proposed by the Joneses are an unreliable guide to the law as it must be applied to the current facts. We will begin by summarizing the familiar principles established in the seminal cases.
"There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." (Comunale v. Traders & General Ins. Co. *670 (1958) 50 Cal.2d 654, 658, 328 P.2d 198.) "This principle applies equally to insurance policies, which are a category of contracts." (Kransco v. American Empire Surplus Lines Ins. Co. (2000) 23 Cal.4th 390, 400, 97 Cal.Rptr.2d 151, 2 P.3d 1.)
The covenant of good faith and fair dealing "is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement." (Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 36, 44 Cal.Rptr.2d 370, 900 P.2d 619.) The covenant is reciprocal, binding both the insurer and the insured. (Commercial Union Assurance Companies v. Safeway Stores, Inc. (1980) 26 Cal.3d 912, 918, 164 Cal.Rptr. 709, 610 P.2d 1038.) In Gruenberg v. Aetna Ins. Co. (1973) 9 Cal.3d 566, 573, 108 Cal.Rptr. 480, 510 P.2d 1032, the court stated in broad terms that the breach of the covenant "sounds in both contract and tort."
In the insurance context, the early cases arose primarily in the context of a breach of the insurer's "duty to accept reasonable settlements" and the duty to act reasonably in investigating and paying the claims of its insured, "two different aspects of the same duty." (Gruenberg v. Aetna Ins. Co., supra, 9 Cal.3d at p. 573, 108 Cal.Rptr. 480, 510 P.2d 1032.) Tort liability for an insurer's bad faith is centered on these aspects of the insurer's duty under the insurance contract. "The parties are bound by a reciprocal obligation of good faith and fair dealing, but the particular duties differ given the differing performance due under the contract of insurance. A fundamental disparity exists between the insured, which performs its basic duty of paying the policy premium at the outset, and the insurer, which, depending on a number of factors, may or may not have to perform its basic duties of defense and indemnification under the policy. [Citation.] An insured is thus not on equal footing with its insurerthe relationship between insured and insurer is inherently unequal, the inequality resting on contractual asymmetry. An insurer's tort liability for breach of the covenant is thus predicated upon special policy factors inapplicable to the insured." (Kransco v. American Empire Surplus Lines Ins. Co., supra, 23 Cal.4th at pp. 404-105, 97 Cal. Rptr.2d 151, 2 P.3d 1.)
Outside the insurance context, the "bad faith" tortthat is, a tort action for breach of the duty of good faith and fair dealing was initially recognized in a variety of circumstances. Court of Appeal cases held, and Supreme Court cases suggested in dicta, that bad faith breach of an employment contract or of any contract in which the parties enjoyed a "special relationship" would give rise to a tort cause of action. (Foley v. Interactive Data Corp. (1988) 47 Cal.3d 654, 685-691, 254 Cal. Rptr. 211, 765 P.2d 373.) The Supreme Court held that a tort cause of action would arise from bad faith denial of the existence of a contract. (Seaman's Direct Buying Service, Inc. v. Standard Oil Co. (1984) 36 Cal.3d 752, 769, 206 Cal.Rptr. 354, 686 P.2d 1158, overruled in part by Freeman & Mills, Inc. v. Belcher Oil Co. (1995) 11 Cal.4th 85, 88, 44 Cal.Rptr.2d 420, 900 P.2d 669.) In Koehrer v. Superior Court (1986) 181 Cal.App.3d 1155, 226 Cal.Rptr. 820, the Court of Appeal "broached the possibility of obtaining tort damages for the breach of any term of a contract whether for employment or otherwise." (Foley v. Interactive Data Corp., supra, 47 Cal.3d 654, 689, 254 Cal.Rptr. 211, 765 P.2d 373, disapproving Koehrer v. Superior Court, supra, 181 Cal.App.3d 1155, 226 Cal.Rptr. 820.)
Koehrer, however, probably represents the high tide line for the tort of bad faith *671 in California. In a series of decisions beginning with Foley v. Interactive Data Corp., supra, 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, the Supreme Court began a dramatic restriction of the applicability of the bad faith tort. In Foley, the court held that tort damages were unavailable for bad faith breach of an employment contract. (Id. at p. 700, 254 Cal.Rptr. 211, 765 P.2d 373.) In Hunter v. Up-Right, Inc. (1993) 6 Cal.4th 1174, 1180-1182, 26 Cal.Rptr.2d 8, 864 P.2d 88, the court held that tort damages were unavailable when an employer had used misrepresentations to induce termination of employment. In Applied Equipment Corp. v. Litton Saudi Arabia Ltd. (1994) 7 Cal.4th 503, 515, 28 Cal.Rptr.2d 475, 869 P.2d 454, the court held that tort damages were not available when a contracting party conspired with another to interfere with his own contract. Finally, in Freeman & Mills, Inc. v. Belcher Oil Co., supra, 11 Cal.4th at page 103, 44 Cal.Rptr.2d 420, 900 P.2d 669, the court overruled Seaman's Direct Buying Service, Inc. v. Standard Oil Co., supra, 36 Cal.3d 752, 206 Cal.Rptr. 354, 686 P.2d 1158, and held that tort damages were not available for bad faith denial of the existence of, or denial of liability under, a contract. Freeman & Mills established "a general rule precluding tort recovery for noninsurance contract breach, at least in the absence of violation of `an independent duty arising from principles of tort law' [citation] other than the bad faith denial of the existence of, or liability under, the breached contract." (Freeman & Mills, Inc. v. Belcher Oil Co., supra, 11 Cal.4th at p. 102, 44 Cal.Rptr.2d 420, 900 P.2d 669.) More recently, the Supreme Court reiterated that it has "cautioned courts to exercise great care in considering whether to extend `the exceptional approach taken in [the insurance cases]' to `another contract setting.'" (Cates Construction, Inc. v. Talbot Partners (1999) 21 Cal.4th 28, 46, 86 Cal.Rptr.2d 855, 980 P.2d 407.)
Thus, the cases from Foley through Freeman & Mills and to the present indicate an unmistakable insistence that judicial creation of the bad faith tort not stray beyond the "insurance cases." Nevertheless, in Freeman & Mills, the court emphasized that "nothing in this opinion should be read as affecting the existing precedent governing enforcement of the implied covenant in insurance cases." (Freeman & Mills, Inc. v. Belcher Oil Co., supra, 11 Cal.4th at p. 103, 44 Cal.Rptr.2d 420, 900 P.2d 669.)
We turn now to the question of what is meant by the "insurance cases." Does this refer to every aspect of an insurance contract, to the limited issues of bad faith payment of claims and unreasonable failure to settle, or to some range of issues between those two poles?
In the recent case of State Comp. Ins. Fund v. Superior Court (2001) 24 Cal.4th 930, 103 Cal.Rptr.2d 662, 16 P.3d 85, the Supreme Court considered a complaint in which the insured alleged facts quite analogous to those before us. The complaint alleged the insurer had misstated financial information received from the insured in order to cause the rating bureau to classify the insured at a higher risk level, thereby producing higher premiums for the insurer. (Id. at p. 937, 103 Cal.Rptr.2d 662, 16 P.3d 85.) After the trial court refused to grant the insurer's motion for judgment on the pleadings based on an issue of statutory immunity, the Supreme Court considered the matter on a petition for review from the appellate court's denial of a writ of mandate. (Id. at p. 932, 103 Cal.Rptr.2d 662,16 P.3d 85.)
In considering the issue of immunity, the court discussed in detail Security Officers Service, Inc. v. State Compensation Ins. Fund (1993) 17 Cal.App.4th 887, 21 *672 Cal.Rptr.2d 653, and many of the other workers' compensation cases upon which the Joneses have relied in the present appeal. In those cases, the insured typically alleges the insurer handled claims in bad faith in order to assess higher insurance premiums against the insured. (We discuss these cases in some detail at a later point in this opinion.) Although approving the rule of law established by those cases, and even though concluding State Compensation Insurance Fund was not immune from suit, the court stated: "We emphasize that in reaching this result we are not asked to and do not reach any conclusion as to whether Schaefer [the insured employer] has stated a valid cause of action against SCIF. We merely determine whether a civil suit based on Schaefer's allegations is precluded by [the statutory] immunity." (State Comp. Ins. Fund v. Superior Court, supra, 24 Cal.4th at p. 944, 103 Cal.Rptr.2d 662, 16 P.3d 85.)
As noted above, the facts of State Comp. Ins. Fund v. Superior Court, supra, 24 Cal.4th 930, 103 Cal.Rptr.2d 662, 16 P.3d 85, are analytically very similar to those of the present case. And, as noted, the Supreme Court discussed with approval the line of workers' compensation bad-faith cases upon which the Joneses rely in the present case. From these two facts, the Joneses conclude "there is no analytically logical distinction" between those workers' compensation bad-faith cases and cases such as the present one and State Comp. Ins. Fund v. Superior Court, supra, 24 Cal.4th 930, 103 Cal.Rptr.2d 662, 16 P.3d 85. Were this so, there would have been no reason for the Supreme Court to "emphasize" that it was not deciding whether the complaint in State Comp. Ins. Fund v. Superior Court, supra, 24 Cal.4th 930, 103 Cal.Rptr.2d 662, 16 P.3d 85, stated a cause of action. Reserving an issue, clearly, is not deciding an issue; nevertheless, reserving an issue in these circumstances is a recognition that, however the issue is ultimately decided, the workers' compensation bad-faith cases are sufficiently different that the facts before the Supreme Court required a separate analysis of the cause-of-action issue.
In State Comp. Ins. Fund v. Superior Court, supra, 24 Cal.4th 930, 103 Cal. Rptr.2d 662, 16 P.3d 85, the Supreme Court was not required to decide the open question whether the tort of insurance bad faith should be extended beyond the claims and settlement area. In the present case, we are asked to and are required to determine whether to do so. We turn to that task.
We are satisfied the "insurance cases" exception preserved in Freeman & Mills does not extend to every breach of an insurance contract. As noted above, the covenant of good faith and fair dealing is reciprocal, binding both the insurer and the insured. (Commercial Union Assurance Companies v. Safeway Stores, Inc., supra, 26 Cal.3d at p. 918, 164 Cal.Rptr. 709, 610 P.2d 1038.) Nevertheless, an insured is not guilty of the tort of bad faith when the insured breaches the covenant; in those circumstances the insurer is limited to contract remedies. (Kransco v. American Empire Surplus Lines Ins. Co., supra, 23 Cal.4th at pp. 404-405, 97 Cal. Rptr.2d 151, 2 P.3d 1.) Accordingly, we may reject any interpretation of the preserved "insurance cases" exception in Freeman & Mills that would permit a tort action for every bad faith breach of an insurance contract.
In addition, however, the logic and language of Foley and other Supreme Court cases persuades us that not every instance of bad faith conduct by an insurer gives rise to a tort cause of action. In particular, we perceive that the general administration of an insurance policy "is *673 not sufficiently similar" to the duties involved in investigating, defending, and settling claims to justify imposition of tort liability on an insurer who acts in bad faith. (See Foley v. Interactive Data Corp., supra, 47 Cal.3d at p. 693, 254 Cal. Rptr. 211, 765 P.2d 373.) Rather, in the performance of such contract administration duties, the obligations of the insurer are much closer to the normal contract duties of the insuredpresent in many policiesto pay premiums, provide information to the insurer, and maintain adequate records to facilitate administration of the contract. (See Kransco v. American Empire Surplus Lines Ins. Co., supra, 23 Cal.4th at pp. 404-405, 97 Cal.Rptr.2d 151, 2 P.3d 1.)
The Supreme Court has taken care to qualify the particular nature of the relationship between an insurer and its insured that justifies imposition of tort liability: "We explained in Gruenberg v. Aetna Ins. Co. (1973) 9 Cal.3d 566[, 575, 108 Cal.Rptr. 480, 510 P.2d 1032] that `[t]he duty [to comport with the implied covenant of good faith and fair dealing] is immanent in the contract whether the company is attending [on the insured's behalf] to the claims of third persons against the insured or the claims of the insured itself. Accordingly, when the insurer unreasonably and in bad faith withholds payment of the claim of its insured it is subject to liability in tort.'" (Foley v. Interactive Data Corp., supra, 47 Cal.3d at p. 684, 254 Cal.Rptr. 211, 765 P.2d 373, brackets in original.)
When an insurer is called upon to act as an insurerthat is, to defend, settle, or pay a claimthree aspects of its relationship with its insured are most distinctive. First, the insurer has virtually sole control of the proceedings, including the decision to settle third-party claims (see Crisci v. Security Ins. Co. (1967) 66 Cal.2d 425, 430-431, 58 Cal.Rptr. 13, 426 P.2d 173) and the decisions to investigate and pay claims by its own insured (see Egan v. Mutual of Omaha Ins. Co. (1979), 24 Cal.3d 809, 816-817, 819, 169 Cal.Rptr. 691, 620 P.2d 141). Second, the insured is subject to financial pressures that the insurance was intended to mitigate. (See McLaughlin v. National Union Fire Ins. Co. (1994) 23 Cal.App.4th 1132, 1158, 29 Cal.Rptr.2d 559.) Third, the insured must initiate action against the insurer in order to obtain the benefits of the insurance policy. The insurer may simply refuse action unless the insured has the financial resources and the perseverance to force the insurer's hand; the insured cannot just go out into the marketplace and purchase replacement coverage for a loss that has already occurred. (See Foley v. Interactive Data Corp., supra, 47 Cal.3d at p. 692, 254 Cal.Rptr. 211, 765 P.2d 373.)
None of these factors is present in the case of a premium dispute such as the one in the present case. In this case the insured can do nothing and make the insurer prove its entitlement to additional premiums in litigation initiated by the insurer (see Old Republic Ins. Co. v. FSR Brokerage, Inc. (2000) 80 Cal.App.4th 666, 688, 95 Cal.Rptr.2d 583) or, in the alternative, the insured can present its records in comprehensible form to the insurer and the Insurance Commissioner for resolution of the dispute. The insured cannot be pressured by the loss of coverage, since the policy term has expired already. While the insured is under the financial pressure shared by any potential litigant with an inchoate claim on the horizon, the insured has not suffered the "calamity" of property or income loss or of a third-party trying to collect a large judgment against it. (See ibid.; see also Crisci v. Security Ins. Co., supra, 66 Cal.2d at p. 428-429, 58 Cal. Rptr. 13, 426 P.2d 173.) Further, as to the disputed premium, the insured has a fast *674 and affordable administrative remedy before an agency that has both formal and informal control over the insurer.
We do not question that an insurer's abuse of its rights to audit the financial records of its insured and to collect an additional premium under an approved rate structure may constitute a breach of the covenant of good faith and fair dealing. Such a breach, however, is fully remediable in a contract action with damages measured according to traditional contract principles.
Nor does protection of the public support allowing tort damages in this type of insurance case. Normally, the motivation of a party in breaching a contract is immaterial; the law of contract normally awards "those damages within the contemplation of the parties at the time [the contract is made] or at least reasonably foreseeable by them at that time." (Cates Construction, Inc. v. Talbot Partners (1999) 21 Cal.4th 28, 61, 86 Cal.Rptr.2d 855, 980 P.2d 407; see Civ.Code, § 3300.) By contrast, it would be highly relevant in an administrative proceeding before the Insurance Commissioner that the commissioner's chosen provider for commercial assigned-risk insurance was engaging in predatory practices. (See Cal.Code Regs., tit. 10, § 2694.) Given the availability of effective administrative oversight as a means of implementing the public policy favoring good faith and fair dealing in assessing insurance premiums, there is no compelling need to extend the bad faith tort beyond the area of breach of the duties to defend, settle, and pay claims, and into the area of ordinary premium disputes. (See Foley v. Interactive Data Corp., supra, 47 Cal.3d at p. 693, 254 Cal. Rptr. 211, 765 P.2d 373.)
The Joneses assert that policyholders do not enter into insurance contacts "seeking to gain a commercial advantage but rather are only seeking protection against calamity," citing Egan v. Mutual of Omaha Ins. Co., supra, 24 Cal.3d at page 819, 169 Cal.Rptr. 691, 620 P.2d 141, and Cates Construction, Inc. v. Talbot Partners, supra, 21 Cal.4th at page 44, 86 Cal.Rptr.2d 855, 980 P.2d 407. From this premise, they conclude that "California courts have long recognized that tort actions against insurers for breach of the covenant of good faith and fair dealing are not limited to those based on policy provisions promising payment of a claim, but instead may be predicated on violation of other policy provisions as well."
Although there certainly is language in earlier cases that supports the Joneses' contention, we do not believe that language withstands scrutiny in the light of the more recent Supreme Court cases. These more recent cases include, for example, Cates Construction, Inc. v. Talbot Partners, supra, 21 Cal.4th at page 44, 86 Cal.Rptr.2d 855, 980 P.2d 407, where the court recites the distinctions drawn in the cases between "insurance contracts" generally and "most other contracts for goods or services." Then the court adds: "In addition, we have observed that the tort duty of a liability insurer ordinarily is based on its assumption of the insured's defense and of settlement negotiations of third party claims. .... The assumption of those responsibilities obligates the insurer to give at least as much consideration to the welfare of its insured as it gives to its own interests so as not to deprive the insured of the benefits of the insurance policy." (Ibid., italics added.) This focus on the duties to defend and settle does not support a broad application of tort law to all bad faith breaches of an "insurance contract."
We have reviewed carefully the cases upon which the Joneses rely for a broad application of the tort of bad faith. Those *675 cases largely fall into two categories. In the first group, cases employ language that was a part of the initial tide of enthusiasm for a universal tort of bad faith, the very tide Foley and its progeny sought to turn. The second group involves the unique field of workers' compensation insurance, where concepts of "experience factor" and "reserve rating" cause the insurers' bad-faith claims settlement practices to result in higher premiums; that is, the higher premiums are a collateral albeit, intendedresult of the underlying bad faith in handling claims.

A. The "Universal" Bad Faith Tort Cases.
The Joneses rely on Spindle v. Travelers Ins. Companies (1977) 66 Cal.App.3d 951, 136 Cal.Rptr. 404. In that case, a medical malpractice insurer had a master contract with a regional association of physicians. According to the allegations of the complaint, the insurer wanted to raise rates for individual doctors by an amount that exceeded the increases permitted by the master contract. When the medical society resisted, the insurer canceled the plaintiffs insurance in order to coerce and intimidate the medical society into permitting the rate increases. (Id. at pp. 954-955, 136 Cal.Rptr. 404.)
In the course of concluding that this complaint stated a tort cause of action for bad faith, the Spindle court made the statements upon which the Joneses rely: "`There is an implied covenant of good faith and fair dealing in every contract .... This principle is applicable to policies of insurance' [Citation omitted; emphasis added by the Spindle court.].... [¶] We are unable to discern any logical basis for distinguishing between an insurer's conduct in settling a claim made pursuant to the policy and that involved in an insurer's cancelling a policy if bad faith conduct is the basis for the cancellation. .... No plausible reason exists why cancellation provisions of a contract should be treated differently from other contractual provisions insofar as application of the implied covenant of good faith and fair dealing is concerned." (Spindle v. Travelers Ins. Companies, supra, 66 Cal.App.3d at p. 958, 136 Cal.Rptr. 404.)
The problem with this analysis from Spindle is the same problem identified and criticized in Foley: While the court correctly concluded the insurer's conduct was a breach of the covenant of good faith and fair dealing, the Spindle court "did not, however, focus on the fact that traditionally such a finding justified only contract damages." (Foley v. Interactive Data Corp., supra, 47 Cal.3d at p. 689, 254 Cal. Rptr. 211, 765 P.2d 373, discussing Khanna v. Microdata Corp. (1985) 170 Cal. App.3d 250, 215 Cal.Rptr. 860.)
The logic of Spindle proceeds from the facts that an insurance contract is just like any other contract and that all contracts include an implied covenant of good faith and fair dealing. (See Spindle v. Travelers Ins. Companies, supra, 66 Cal.App.3d at p. 958, 136 Cal.Rptr. 404.)
Accordingly, Spindle concludes, every provision of an insurance contract should be subject to enforcement through the bad faith tort, just as is every provision of every contract, consistent with "the evolvement of the doctrine of the implied covenant of good faith and fair dealing [which] is an expression of public policy in our state." (Id, at p. 959, 136 Cal.Rptr. 404, italics in original.)
The problem is, of course, that what may have seemed like an evolving, generalized bad faith tort in 1977 can no longer be viewed in that manner after Foley and its progeny.
*676 The Joneses also rely on Johnson v. Mutual Ben. Life Ins. Co. (9th Cir.1988) 847 F.2d 600 for the proposition that "incorrect billing statements and termination notices, sent over a two-year period, arguably deprive[ ]" an insured of the bargained-for "peace of mind" that is one of the benefits an insured seeks by obtaining insurance. (See id. at p. 603.) Once again, however, the Ninth Circuit's Johnson opinion preceded the California Supreme Court's decision in Foley, and Johnson fails to anticipate the restrictive interpretation of the bad faith tort espoused in Foley and the subsequent cases.
We agree with Johnson and the Joneses to this extent: in one sense, the "peace of mind" afforded by an insurance policy uniquely supports the availability of tort damages in the insurance context. That uniqueness arises, however, precisely from the claims-resolution functions of an insurance policy. An insured derives peace of mind from knowing that when accident, disability, or death (or whatever other risk is insured) occurs, and it is otherwise too late to protect himself or herself against the financial burden of the calamity, the insurance will mitigate the degree of harm.
In many other ways, however, the peace of mind involved in buying insurance is the kind common to consumer and commercial transactions of every sort. The householder gains peace of mind from the "contract" for the purchase of groceries to stock the family pantry; the business owner gains peace of mind from a distribution contract with a supplier or manufacturer of goods, who in turn gains peace of mind from the contract that assures a ready outlet for its product; an insured gains peace of mind knowing he or she has gotten the best possible "deal" on insurance or that he or she has been able to obtain the necessary insurance required to engaged in a regulated business, such as trucking.
In all of these common instances the desire for peace of mind is a primary motivation for the contracting parties to enter the marketplace in the first instance. A focus on the broad concept of peace of mind as a benefit of any particular contract does not provide an analytical basis on which to impose tort liability for the bad faith deprivation of that benefit.
Instead, as Foley requires, the analysis must be based upon an evaluation of the manner in which the proposed application of the bad faith tort is supported by the reasons particular to the application of the bad faith tort in the areas of insurance claims, settlement, and duty to defend. (See Foley v. Interactive Data Corp., supra, 47 Cal.3d at pp. 690, 693, 254 Cal. Rptr. 211, 765 P.2d 373; see also New Plumbing Contractors, Inc. v. Nationwide Ins. Co. (1992) 7 Cal.App.4th 1088, 1096-1097, 9 Cal.Rptr.2d 469 [contrasting "marketplace aspect" of the insurance relationship with the "fiduciary-type relationship which pertains only to the receipt of benefits under the insurance policy"].)
In sum, we conclude the pre-Foley cases do not provide a sufficient analysis to make them useful as precedent in the present circumstances. At most, the cases stand for the proposition that the present facts may have constituted a cause of action in an earlier era.
The Joneses rely on one post-Foley case, Helfand v. National Union Fire Ins. Co. (1992) 10 Cal.App.4th 869, 903, 13 Cal. Rptr.2d 295, for the broad proposition that the insurer can be liable in tort for bad faith concerning any clause in an insurance contract. That case, however, was on appeal from a trial court's order, in effect, requiring specific performance of an insurance policy, the third year of which the insurer sought to cancel in bad faith. (Id. at pp. 906-907. 13 Cal Rptr.2d 295.) Because it involves only a contract remedy, *677 statements in Helfand concerning tort remedies are dictum.[3]
Furtherand of even greater importancethe purpose of the cancellation of the directors' and officers' liability policy in Helfand was to avoid payment of claims that were certain to arise after the company filed for bankruptcy protection. (Helfand v. National Union Fire Ins. Co., supra, 10 Cal.App.4th at p. 904, 13 Cal. Rptr.2d 295.) Claims which were "reasonably foreseeable at the policy's inception" had become "imminent and unavoidable on the part of the prepaid insured at the time of cancellation." (Id. at p. 906, 13 Cal. Rptr.2d 295.) Accordingly, the bad faith actions of the insurer in Helfand involved the core duties to defend and settle claims arising under the policy; cancellation of the policy was simply the means by which the insurer sought to accomplish its repudiation of those duties. (See also McLaughlin v. National Union Fire Ins. Co., supra, 23 Cal.App.4th at p. 1157, 29 Cal.Rptr.2d 559.)

B. The Workers' Compensation Cases
In their reliance on workers' compensation cases for the principle that bad faith assessment of premiums constitutes tortious bad faith, the Joneses confuse the breach of the duty of good faith and fair dealing with the damages resulting from that breach. The matter is summarized clearly in one of the cases the Joneses cite, Security Officers Service, Inc. v. State Compensation Ins. Fund, supra, 17 Cal. App.4th 887, 21 Cal.Rptr.2d 653. "Does the implied covenant of good faith and fair dealing require a workers' compensation insurer to defend and resolve claims with due regard to the impact of outstanding claims and reserves on the premiums the insured will be assessed and on policy dividends it may receive?" (Id. at pp. 899-890, 21 Cal.Rptr.2d 653, italics added.) The case authorities "clearly instruct that the implied covenant of good faith and fair dealing imposes limits on the insurer's latitude in discharging its contractual right or duty to defend, investigate and settle claims..... The question presented here is whether such standards, imposed by the implied covenant, govern not only the insurer's freedom to accept or reject settlement offers, but also its discretion in leaving claims unresolved and outstanding, and in fixing monetary reserves to account for the future resolution." (Id. at p. 895, 21 Cal.Rptr.2d 653, italics added.)
In other words, in workers' compensation insurance, the premium is directly tied to the insured's claims experience, and that claims experience is controlled in significant part by the insurer's exercise of discretion in settling claims (or not). Thus, in the workers' compensation setting the insurer's bad-faith motivation in handling claims is alleged to be the establishment of a basis for charging higher premiums (Security Officers Service, Inc. v. State Compensation Ins. Fund, supra, 17 Cal.App.4th at p. 893, 21 Cal.Rptr.2d 653); in the traditional insurance setting, the insurer's motivation for a bad faith claims *678 handling policy is to save money. Nevertheless, in both instances, the operative exercise of discretion by the insurer is in the narrow area of settling claims and defending its insured.
Typical of the cited cases is the introductory paragraph from Tricor California, Inc. v. State Compensation Ins. Fund (1994) 30 Cal.App.4th 230, 233, 35 Cal. Rptr.2d 550: "Tricor alleged SCIF engaged in bad faith claims handling resulting in Tricor's paying unjustified higher premiums and wrongly being denied dividends. .... We hold that Tricor properly could present evidence of negligent claims handling as evidence of bad faith and breach of contract by SCIF...."
As we have seen, these are precisely the areas in which policy considerations articulated by the Supreme Court (see Foley v. Interactive Data Corp., supra, 47 Cal.3d at p. 684, 254 Cal.Rptr. 211, 765 P.2d 373) have countenanced the "exceptional approach" taken in the traditional insurance bad faith situation. (Id. at p. 690, 254 Cal.Rptr. 211, 765 P.2d 373; see Kransco v. American Empire Surplus Lines Ins. Co., supra, 23 Cal.4th at pp. 404-405, 97 Cal.Rptr.2d 151, 2 P.3d 1.) We conclude the workers' compensation cases cited by the Joneses, most of which involve minor variations on the type of claim made in Security Officers Service, Inc. v. State Compensation Ins. Fund, supra, 17 Cal. App.4th 887, 21 Cal.Rptr.2d 653, do not support the establishment of a tort of bad faith when the only dispute between the parties involves assessment of premiums, without the involvement of the insurer's underlying duty to pay, settle, and defend the insured against claims.[4]
Consistent with the Supreme Court's admonition to exercise great caution in extending the bad faith tort beyond the traditional setting of defending and settling claims under an insurance contract, we conclude that there are no reasons of policy or precedent that support introduction of a tort remedy for an insurer's bad faith actions in non-claims administration of a liability insurance policy.

II.-III.[**]

DISPOSITION
The judgment is reversed. The matter is remanded to the trial court with directions that the trial court direct the Joneses to pursue to finality an administrative complaint under title 10, section 2495, California Code of Regulations. The court shall stay proceedings in the present case until and unless either party petitions for dissolution of the stay based on the final administrative outcome, at which time the trial court shall conduct further proceedings consistent with the views expressed herein. Cal-Eagle Insurance Company and Jonathan Neil & Associates, Inc., are awarded costs on appeal from the *679 Joneses. Johnsey Insurance Company shall bear its own costs on appeal.
WE CONCUR: BUCKLEY and WISEMAN, JJ.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and III.
[1] In 1996, regulatory authority was shifted to the Department of Motor Vehicles and the Highway Patrol (see Veh.Code, § 34600 et seq.).
[2] The criteria listed in revised rule 23 are:

"(a) Any hired carrier with whom the insured trucker contracts to carry or subhaul must operate under its own California PUC operating authority.
"(b) No written lease or oral rental agreement shall exist between the insured trucker and the hired carrier; however, a separate, written subhaul agreement which complies with California PUC requirements shall be executed between the insured trucker and the hired carrier. This subhaul agreement shall make the hired carrier's insurance primary, make the hired carrier responsible for all claims and/or liabilities, name the insured trucker as an additional insured on the hired carrier's policy, provide that the hired carrier's insurer will notify the insured trucker if the hired carrier's policy is canceled, and require minimum limits of not less than the applicable California PUC-required minimum limits.
"(c) The insured trucker shall have on file copies of all subhaul agreements for audit by the CAIP Servicing Carrier.
"(d) The insured trucker shall not dispatch or exert any control over the means by which the hired carrier fulfills the obligations of the subhaul agreement; the hired carrier shall exercise independent control over the equipment operated and the drivers or persons operating that equipment.
"(e) The insured trucker shall maintain a separate subhaul register which complies with California PUC requirements. This register shall be made available for audit and/or review by the CAIP Serving Carrier, the Plan, and/or the California Insurance Commissioner.
"(f) The CAIP Servicing Carrier, the California Insurance Commissioner, and the Plan shall have access to the insured trucker's books and records for a period of three years after the date of cancellation or non-renewal of the policy to audit and determine compliance with the requirements of this section. If upon audit it is determined that there has not been compliance with the requirements of this section, the premium for the hired carrier exposure will be recomputed in accordance with the provisions of paragraph C.2.b. below."
[3] Similarly, the post-Fofey case of Williams v. State Farm Fire & Casualty Co. (1990) 216 Cal.App.3d 1540, 1544, footnote 4, 265 Cal. Rptr. 644, does not address whether tort or contract damages would be appropriate for bad faith cancellation of a policy during an initial 60-day cancellation period reserved to the insurer in the policy. The court merely notes that "the insurer's right to cancel is also limited by the covenant of good faith and fair dealing implied in every insurance contract." (Ibid.) As we have stated repeatedly in this opinion, we do not question in any way the applicability of the covenant to each and every aspect of a party's conduct in discharging its duties under a contract; the issue before us is whether a tort cause of action arises from breach of the covenant in particular circumstances. The brief statement in Williams does not address the issue before us.
[4] Two of the cases cited by the Joneses involve only the issue of State Compensation Insurance Fund's claim of immunity from suit. (See Maxon Industries, Inc. v. State Compensation Ins. Fund (1993) 16 Cal. App.4th 1387, 20 Cal.Rptr.2d 730; Courtesy Ambulance Service v. Superior Court (1992) 8 Cal.App.4th 1504, 11 Cal.Rptr.2d 161.) The other cases cited by the Joneses all involve claims handling and loss reserve practices of the insurer, as those practices affect the insured's premiums. (See MacGregor Yacht Corp. v. State Comp. Ins. Fund (1998) 63 Cal. App.4th 448, 74 Cal.Rptr.2d 473; Lance Camper Manufacturing Corp. v. Republic Indemnity Co. (1996) 44 Cal.App.4th 194, 51 Cal.Rptr.2d 622; Tricor California, Inc. v. State Compensation Ins. Fund, supra, 30 Cal. App.4th 230, 35 Cal.Rptr.2d 550; Mission Ins. Group, Inc. v. Merco Construction Engineers, Inc. (1983) 147 Cal.App.3d 1059, 195 Cal.Rptr. 781.)
[**] See footnote *, ante.