[No. B159982. Second Dist., Div. One. Mar. 11, 2004.]

SAM DONABEDIAN, Plaintiff and Appellant, v.
MERCURY INSURANCE COMPANY, Defendant and Respondent.

970

## Counsel

Goshgarian & Marshall, Mark Goshgarian; Roxborough, Pomerance & Nye, Drew E. Pomerance and Vincent S. Gannuscio for Plaintiff and Appellant.

Harvey Rosenfield, Pamela M. Pressley; Roger Brown and Associates, Jay Angoff; Public Advocates, Inc., and Richard A. Marcantonio for the Foundation for Taxpayer and Consumer Rights as Amicus Curiae on behalf of Plaintiff and Appellant.

Gary M. Cohen, Elizabeth Mohr and Bryant Henley for California Department of Insurance as Amicus Curiae on behalf of Plaintiff and Appellant.

Douglas L. Hallett, Marc J. Levine, Joseph B. Miller; and Victor Poltrock for Defendant and Respondent.

Heller Ehrman White & McAuliffe, Vanessa Wells and Pamela H. Davis for State Farm Mutual Automobile Insurance Company as Amicus Curiae on behalf of Defendant and Respondent.

## Opinion

**MALLANO, J.**—Proposition 103, approved by the voters on November 8, 1988, requires automobile insurance companies to determine rates, premiums, and insurability based on certain rating factors.

Plaintiff, whose automobile was insured with Mercury Insurance Company (Mercury), filed this action under California's unfair competition law (UCL) (Bus. & Prof. Code, §§ 17200–17210), alleging that Mercury had used applicants' absence of prior insurance, in and of itself, in determining premiums, a discount for good driving, and insurability, all in violation of Proposition 103.

Mercury demurred to the complaint on the ground that the Insurance Commissioner had exclusive jurisdiction over plaintiff's claim. The trial court sustained the demurrer without leave to amend and dismissed the case.

The question on appeal is whether Proposition 103 permits a person to maintain a civil action under the UCL where the complaint alleges that an insurer has used an applicant's absence of prior insurance, in and of itself, in determining premiums, a discount for good driving, or insurability. We answer that question in the affirmative because the plain language of Proposition 103 and its legislative history compel that conclusion.

# I

## BACKGROUND

Section 1861.02 of the Insurance Code, enacted by Proposition 103, provides that "[r]ates and premiums for an automobile insurance policy . . . shall be determined by application of the following factors in decreasing order of importance: [¶] (1) The insured's driving safety record. [¶] (2) The number of miles he or she drives annually. [¶] (3) The number of years of driving experience the insured has had. [¶] (4) Those other factors that the [Insurance] [C]ommissioner may adopt by regulation and that have a substantial relationship to the risk of loss." (Ins. Code, § 1861.02, subd. (a)(1)–(4); all further statutory references are to the Insurance Code unless otherwise indicated.)

At the crux of this case is the provision of Proposition 103 that provides, "The absence of prior automobile insurance coverage, in and of itself, shall not be a criterion for determining eligibility for a Good Driver Discount policy, or generally for automobile rates, premiums, or insurability." (§ 1861.02, former subd. (c).)[1] An insured is entitled to a "Good Driver Discount" of at least 20 percent if, subject to specified exceptions, he or she has been licensed to drive for the previous three years and, during that period, has not had more than one at-fault accident. (§§ 1861.02, subd. (b), 1861.025.)

In 1996, the Insurance Commissioner adopted regulations listing "persistency" as one of several optional rating factors. (See Dept. of Ins., Initial Statement of Reasons, RH-402 (Dec. 21, 2001) p. 1; Cal. Code Regs., tit. 10, § 2632.5, subd. (d)(11), Register 96, No. 27 (July 5, 1996) pp. 728.11–728.12.) The regulations did not define that term (*ibid.*), resulting in a lack of uniform application by insurers.

As the Insurance Commissioner eventually recognized, "insurers have implemented differing interpretations of the meaning of persistency as an

---

[1] Although it is of no consequence here, in 2003, the Legislature amended section 1861.02, subdivision (c) to read: "The absence of prior automobile insurance coverage, in and of itself, shall not be a criterion for determining eligibility for a Good Driver Discount policy, or generally for automobile rates, premiums, or insurability. However . . . an insurer may use persistency of automobile insurance coverage with the insurer, an affiliate, or another insurer as an optional rating factor. . . . Persistency shall be deemed to exist even if there is a lapse of coverage of up to two years due to an insured's absence from the state while in military service, and up to 90 days in the last five years for any other reason." (Stats. 2003, ch. 169, § 1.) The effect and validity of this amendment is being challenged in other proceedings and is not before us. Our references to section 1861.02, subdivision (c) are to the statute before amendment.

optional rating factor. Some insurers have interpreted persistency to mean the length of time a consumer has continuously maintained automobile insurance exclusively with the present insurer. Other insurers have defined persistency more broadly to include coverage by different insurers, so long as there is not a lapse in coverage. The Commissioner has noted that some of these insurers required consumers to provide evidence of prior insurance to show that the consumer was 'persistently' covered by one insurer or another over time." (Dept. of Ins., Notice of Proposed Action and Notice of Public Hearing, (Dec. 21, 2001), proposed amendment to Cal. Code Regs., tit. 10, § 2632.5, subd. (d)(11) <http://www20.insurance.ca.gov/epubacc/reg/3401.htm> [as of Mar. 11, 2004].)

On April 20, 2001, plaintiff, an insured with Mercury, filed this action, alleging that, at some point after Proposition 103 became effective on November 8, 1989, Mercury violated the UCL by using the absence of prior insurance, in and of itself, as a criterion in determining eligibility for the Good Driver Discount, generally for automobile premiums and insurability, and in applying a persistency discount.

Mercury filed a demurrer, arguing that plaintiff's claim involved ratemaking and was thus within the exclusive jurisdiction of the Insurance Commissioner. The trial court sustained the demurrer with leave to amend and then stayed proceedings so that plaintiff could present the dispute to the commissioner.

By letter dated September 17, 2001, counsel for plaintiff wrote to the Insurance Commissioner, describing Mercury's alleged wrongful conduct, submitting a copy of the complaint filed in this suit, and asking the commissioner to conduct a public hearing and take action on the matter.

The commissioner responded by order dated January 29, 2002, stating: "[Plaintiff] in the present matter ha[s] alleged that [Mercury] 'engaged in a uniform and system-wide course of conduct which deprived those policyholders without prior history of automobile insurance of the benefits of Proposition 103 as well as the Good Driver Discount by offsetting all, if not a substantial portion, of the discount with a discount [Mercury has] classified as a persistency discount which is implemented in such a way as to deny those without prior insurance of the benefits thereunder.' . . .

"When the Department of Insurance (hereafter 'Department') adopted 'persistency' as an optional rating factor, . . . that term was not expressly defined. The Department is aware that some insurance companies have interpreted 'persistency' broadly; to authorize a credit to persons who have switched insurance carriers, but have been continuously insured. Such a

definition necessarily requires [an insurance] company to consider a consumer's prior insurance, or lack thereof. In the Commissioner's opinion, this type of stretched interpretation of 'persistency' would violate Insurance Code section 1861.02, subdivision (c). Presently, the Department is in the process of promulgating a definition of persistency that will address this issue industry-wide, and emphatically preclude such an interpretation by all insurers. A Notice of Proposed Regulatory Action was published in the California Notice Register on January 4, 2002. A public hearing regarding this definition is set for February 28, 2002. . . . The Department anticipates, therefore, that the new regulation will be in effect some time later this year.

" 'The doctrine of primary jurisdiction . . . provides the appropriate administrative agency with an opportunity to act if it so chooses.' . . . Without addressing the merits of [plaintiff's] allegations in this case, the Department finds that it would be an inefficient allocation of Department resources to adjudicate every [insurance] company's class plan piecemeal in order to solve this problem. The ambiguity and potential for abuse of the current optional rating factor 'persistency' cr[y] out for resolution via rulemaking. Therefore, because the Department anticipates that the proposed definition . . . represents the best and most efficient way to resolve [plaintiff's] concerns, the Department declines to accept jurisdiction at this time." (Citation omitted.)

On February 1, 2002, Mercury filed a motion for reconsideration with the Insurance Commissioner, who interpreted the motion as requesting a ruling on whether Mercury's rating plan, on its face, or in its application, violated section 1861.02, subdivision (c), which prohibits an insurer from using the lack of prior insurance as a rating criterion. By order dated February 14, 2002, the commissioner denied the motion, stating: "Mercury presents neither relevant facts that were previously unavailable, nor new statutory or case law. . . . Mercury's request is in fact a mere request to reargue matters that were already presented to the Commissioner, or could have been before the Commissioner in the exercise of reasonable diligence."

On August 27, 2002, the Department adopted its proposed regulation on persistency, which states: "At policy renewal, persistency credit may be applied by an insurer or affiliate for the current named insured. Persistency credit may also be applied when issuing a separate new automobile policy for a person who is not the named insured on a policy, but is otherwise *currently insured*. [¶] . . . An insurer shall not apply a persistency credit for a new policy issued to an individual, unless that individual is *currently insured*. Nor shall any insurer apply persistency, at any time, when based in whole or in part upon automobile insurance coverage provided by a non-affiliated insurer. [¶] . . . For purposes of this subsection, 'currently insured' means a person who is *presently covered* for automobile insurance by *the insurer or affiliate*

. . . ." (Cal. Code Regs., tit. 10, § 2632.5, subd. (d)(11)(A), (B), (D), Register 2002, No. 36-Z (Aug. 27, 2002) p. 1812, italics added.)

Meanwhile, in this litigation, plaintiff filed a first amended complaint (complaint). Mercury demurred on the same ground as before. The trial court sustained the demurrer without leave to amend, concluding that the Insurance Commissioner had exclusive jurisdiction over plaintiff's claim. An order of dismissal and judgment were entered in Mercury's favor. Plaintiff filed a timely appeal.

## II

## DISCUSSION

In reviewing the ruling on a demurrer, "we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. . . . We also consider matters which may be judicially noticed.' . . . When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. . . . And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58], citations omitted; accord, Code Civ. Proc., § 452.) All material allegations of the complaint are accepted as true. (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 8, fn. 3 [32 Cal.Rptr.2d 244, 876 P.2d 1043].)

Because this appeal presents issues of statutory construction, we follow " '[t]he fundamental rule . . . that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. . . .' . . . In determining that intent, we first examine the words of the statute itself. . . . Under the so-called 'plain meaning' rule, courts seek to give the words employed by the Legislature their usual and ordinary meaning. . . . If the language of the statute is clear and unambiguous, there is no need for construction. . . . However, the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose. . . . If the terms of the statute provide no definitive answer, then courts may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. . . . ' "We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." . . .' . . . The legislative purpose will not be sacrificed to a literal construction of any part of the statute . . . ."

(*Bodell Construction Co. v. Trustees of Cal. State University* (1998) 62 Cal.App.4th 1508, 1515–1516 [73 Cal.Rptr.2d 450], citations omitted.)

A. *Plain Meaning*

Proposition 103's purpose and the plain meaning rule compel the conclusion that plaintiff may litigate his claim under the UCL. " 'The purpose of [the Proposition] is to protect consumers from arbitrary insurance rates and practices, to encourage a competitive insurance marketplace, to provide for an accountable Insurance Commissioner, and to ensure that insurance is fair, available, and affordable for all Californians.' [¶] . . . [¶] '. . . This [law] shall be liberally construed and applied in order to fully promote its underlying purposes. . . .' " (Historical and Statutory Notes, 42A West's Ann. Ins. Code (1993 ed.) foll. § 1861.01, p. 649.)

■ With respect to the plain meaning rule, Proposition 103 added three pertinent sections to the Insurance Code. First, section 1861.02, subdivision (c) prohibits insurers from using the absence of prior insurance, in and of itself, as a criterion in determining eligibility for the Good Driver Discount or generally for automobile rates, premiums, or insurability. Second, section 1861.03, subdivision (a) provides that "[t]he business of insurance shall be subject to the laws of California applicable to any other business, including, but not limited to, the Unruh Civil Rights Act . . . and the antitrust and unfair business practices laws . . . ," which includes the UCL. Finally, section 1861.10, subdivision (a) states that "[*a*]*ny person may* initiate or intervene in any proceeding permitted or established pursuant to this chapter, challenge any action of the commissioner under this article, and *enforce any provision of this article*" (italics added), which includes the statutory ban on using the lack of prior insurance as a rating criterion. These three sections, read together and liberally construed, provide the necessary procedure and substance to permit the present suit.

Mercury counters that two other sections of the Insurance Code, which predate Proposition 103, bar this action. We address each.

■ First, section 1860.1 states that "[n]o act done, action taken or agreement made pursuant to the authority conferred by *this chapter* shall constitute a violation of or grounds for prosecution or civil proceedings under *any other law* of this State heretofore or hereafter enacted which does not specifically refer to insurance." (Italics added.) But the three Insurance Code sections that authorize this action are not "other law"—they are part of the same *chapter* as section 1860.1.

■ Second, section 1860.2 provides: "The administration and *enforcement* of this *chapter* shall be governed solely by the provisions of this *chapter*. Except

as provided in this *chapter*, no *other law* relating to insurance and no other provisions in this code heretofore or hereafter enacted shall apply to or be construed as supplementing or modifying the provisions of this chapter unless such other law or other provision expressly so provides and specifically refers to the sections of this chapter which it intends to supplement or modify." (Italics added.) Once again, the statutory sections that permit this suit are part of the same *chapter* as section 1860.2 and are not "other law." (See *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 42–55 [77 Cal.Rptr.2d 709, 960 P.2d 513] [statutes applicable to title insurer, which are virtually identical to sections 1860.1 and 1860.2, do not preclude UCL action alleging restraint of trade and false advertising].)

The decision in *Wilson v. Fair Employment & Housing Com.* (1996) 46 Cal.App.4th 1213 [54 Cal.Rptr.2d 419] (*Wilson*) is not to the contrary. In that case, an insurer issued a liability policy to a company but refused to provide coverage for the company pilot because he was over the age of 60. The issue before the court was whether the pilot's *administrative* age discrimination charge under the Unruh Civil Rights Act should be heard by the Fair Employment and Housing Commission or the Insurance Commissioner. In holding that the commissioner had jurisdiction, the court pointed out that, under Proposition 103, the commissioner is vested with authority to determine "whether a rate is . . . unfairly discriminatory." (*Wilson, supra,* 46 Cal.App.4th at p. 1222, quoting § 1861.05, subd. (a).) The court also commented: "[Plaintiff] did not file a complaint in *superior court* seeking damages or other relief for an Unruh Civil Rights Act violation. We therefore do not address the possibility of such a complaint filed *directly with the court* without prior administrative action." (*Wilson, supra,* 46 Cal.App.4th at p. 1224, fn. 7, italics added.)

■ In contrast, the present case does not involve a question of jurisdiction between two administrative agencies, plaintiff's claim does not allege discriminatory conduct, and Proposition 103 expressly authorizes this suit: Under section 1861.10, subdivision (a), "[a]ny person may . . . enforce any provision of this article," including section 1861.02, subdivision (c), which prohibits an insurer from using the lack of prior insurance as a rating criterion.[2]

## B. *Legislative History*

Mercury's reliance on Proposition 103's legislative history is also unavailing. That history dates back to 1944, "[when] the United States Supreme

---

[2] The UCL states that "[u]nless *otherwise expressly provided*, the remedies or penalties provided by this [law] are cumulative to each other and to the remedies or penalties available under all other laws of this state." (Bus. & Prof. Code, § 17205, italics added.) Nothing in sections 1860.1 or 1860.2 or Proposition 103 expressly provides otherwise.

Court held that the commerce clause grants Congress the power to regulate insurance transactions conducted across state lines and that such transactions are subject to the provisions of the Sherman Antitrust Act. (*U.S. v. Underwriters Assn.* (1944) 322 U.S. 533 [88 L.Ed. 1440, 64 S.Ct. 1162].) . . .

" 'The impact of the [high] court's decision was almost immediately restricted through the enactment of the McCarran-Ferguson Act [(15 U.S.C. §§ 1011–1015)], which declared that the business of insurance should continue to be "subject to the laws of the several States which relate to the regulation or taxation of such business." However, the act also provided that federal regulatory legislation would be "applicable to the business of insurance *to the extent that such business is not regulated by State law.*" ' . . .

" 'Promptly after the McCarran-Ferguson Act was adopted, state insurance commissioners and industry representatives joined forces in a nationwide movement which sought the enactment in every state of legislation that would satisfy the requirements for state regulation established by the McCarran-Ferguson Act and thereby exempt insurers from federal regulatory legislation[, including antitrust laws].' . . . In 1946, a model act was drafted. . . . '[B]y 1950 rate regulatory legislation had been adopted in every state.' . . . Most of these laws adopted the basic standard of the model act that no rate shall be 'excessive, inadequate, or unfairly discriminatory.' . . .

"California enacted the McBride-Grunsky Insurance Regulatory Act of 1947 [(McBride Act)] which added chapter 9 to part 2, division 1, of the Insurance Code. . . . Employing language from the model act, the McBride[] Act stated that one purpose of chapter 9 was to regulate the rates of most types of insurance 'to the end that they shall not be excessive, inadequate or unfairly discriminatory.' . . . The Legislature emphasized, however, that this goal was to be achieved through open competition in the insurance market rather than by state regulation: 'It is the express intent of this chapter to permit and encourage competition between insurers on a sound financial basis and nothing in this chapter is intended to give the Commissioner power to fix and determine a rate level by classification or otherwise.' . . ." (*Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1257–1258 [48 Cal.Rptr.2d 12, 906 P.2d 1112], citations omitted, italics in original.)

One primary purpose of the McBride Act was "to authorize cooperation between insurers in rate making and other related matters." (Former § 1850, enacted by Stats. 1947, ch. 805, § 1, p. 1896, repealed by Proposition 103, § 7.) To that end, the act provided: "Subject to and in compliance with the provisions of this chapter . . . , two or more insurers may act in concert with each other and with others with respect to any matters pertaining to the making of rates or rating systems, the preparation or making of insurance

policy or bond forms, underwriting rules, surveys, inspections and investigations, the furnishing of loss or expense statistics or other information and data, or carrying on of research." (Former § 1853, enacted by Stats. 1947, ch. 805, § 1, p. 1898, repealed by Proposition 103, § 7.)

In a letter to Governor Earl Warren, supporting passage of the McBride Act, Deputy Insurance Commissioner John R. Maloney stated, " 'It is generally conceded that concert of action in the making of insurance rates is not only desirable but necessary by reason of the very nature of insurance. Accordingly, to prevent the application of the Federal Anti-trust Laws to this necessary activity in the insurance field of interstate commerce it is essential that state legislation be enacted to affirmatively authorize such concert of action in the making of insurance rates to the extent consistent with the public interest and to regulate such concert of action.' " (*State Comp. Ins. Fund v. Superior Court* (2001) 24 Cal.4th 930, 939 [103 Cal.Rptr.2d 662, 16 P.3d 85] (*SCIF*).)

Under the McBride Act, "[a]utomobile liability insurance in California [was] provided primarily by a private, competitive, largely unregulated market. California ha[d] less regulation of insurance than any other state, and in California automobile liability insurance [was] less regulated than most other forms of insurance.

"[Through the McBride Act, the Legislature] . . . enact[ed] the minimal regulation required to exempt California insurance from federal antitrust law. . . . The principal provision . . . provide[d] that 'Rates shall not be excessive or inadequate, as herein defined, nor shall they be unfairly discriminatory. [¶] No rate shall be held to be excessive unless (1) such rate is unreasonably high for the insurance provided and (2) a reasonable degree of competition does not exist in the area with respect to the classification to which such rate is applicable.' . . .

"A person objecting to a rate or classification [could] complain to the insurer. . . . If dissatisfied with the insurer's action, he [could] request a hearing before the Commissioner. . . . If the Commissioner believe[d] the complaint state[d] probable cause to find a violation . . . , he [could] hold hearings . . . , render findings . . ., and impose sanctions . . . . His decisions [were] subject to judicial review.[3]

"Insurers [did] not file rates with the Commissioner, nor [did] rates require his approval. He [was] forbidden to set or fix rates. . . . Rates [came] to his

---

[3] In 1987, the McBride Act was amended to permit an aggrieved person to file a complaint directly with the commissioner. (Stats. 1987, ch. 1289, § 1, pp. 4611–4612.)

attention only when, sua sponte or in response to a complaint, the Commissioner request[ed] such information from the insurer. The Commissioner assert[ed] no authority over refusals to insure, and complaints charging that an insurer ha[d] unreasonably refused to insure [were] routinely rejected as raising an issue beyond the Commissioner's jurisdiction." (*King v. Meese* (1987) 43 Cal.3d 1217, 1240–1241 [240 Cal.Rptr. 829, 743 P.2d 889] (conc. opn. of Broussard, J.), citations omitted.) In short, under the McBride Act, the commissioner had exclusive jurisdiction to adjudicate complaints about insurance rates but had practically no authority to regulate them effectively. (See §§ 1858–1859.1; *Karlin v. Zalta* (1984) 154 Cal.App.3d 953, 970–972, 976, 983, 986, & fn. 23 [201 Cal.Rptr. 379] [discussing enforcement of McBride Act before enactment of Proposition 103], criticized on another point in *Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 263 [41 Cal.Rptr.2d 220, 895 P.2d 56].)

This regulatory scheme changed substantially with the approval of Proposition 103. "Section 1 of Proposition 103, under the heading 'Findings and Declaration,' states that: 'Enormous increases in the cost of insurance have made it both unaffordable and unavailable to millions of Californians. [¶] The existing laws inadequately protect consumers and allow insurance companies to charge excessive, unjustified and arbitrary rates. [¶] Therefore, the People of California declare that insurance reform is necessary.' . . . Among the reforms then listed is that 'automobile insurance rates shall be determined primarily by a driver's safety record and mileage driven.' . . . Section 2, under the heading 'Purpose,' indicates that the Proposition was intended 'to protect consumers from arbitrary insurance rates and practices, to encourage a competitive insurance marketplace, to provide for an accountable Insurance Commissioner, and to ensure that insurance is fair, available, and affordable for all Californians.' . . . [¶] In addition to the rating factor provisions of section 1861.02, subdivision (a), the Proposition added section 1861.05, subdivision (a), which provides that: 'No rate shall be approved or remain in effect which is excessive, inadequate, unfairly discriminatory or otherwise in violation of this chapter. In considering whether a rate is excessive, inadequate or unfairly discriminatory, no consideration shall be given to the degree of competition and the commissioner shall consider whether the rate mathematically reflects the insurance company's investment income.' " (*Spanish Speaking Citizens' Foundation, Inc. v. Low* (2000) 85 Cal.App.4th 1179, 1193–1194 [103 Cal.Rptr.2d 75], citations omitted.)

"The passage of Proposition 103 made 'numerous fundamental changes in the regulation of automobile and other types of insurance.' . . . Prior to passage of the initiative, California was 'a so-called "open rate" state, that is, rates [were] set by insurers without prior or subsequent approval by the Insurance Commissioner.' . . .

"Subsequent to passage of Proposition 103, '[e]very insurer which desires to change any rate shall file a complete rate application with the commissioner.' . . . 'The commissioner shall notify the public of any [such] application.' A hearing may be held if the commissioner, either on his or her own motion or pursuant to the request of a consumer, determines to do so and must be held, upon timely request, if the proposed rate increase exceeds seven percent for 'personal lines' or fifteen percent for 'commercial lines.' " (*California Auto. Assigned Risk Plan v. Garamendi* (1991) 232 Cal.App.3d 904, 910 [283 Cal.Rptr. 562] (opn. of George, J.), citations and fn. omitted.)

"The statutes and regulations provide for consumer participation in the administrative ratesetting process. (Ins. Code, §§ 1861.10, 1861.05–1861.08; Cal. Code Regs., tit. 10, §§ 2648.2, 2652.9.) Judicial review of the commissioner's decision is available by timely petition for writ of administrative mandamus. (§§ 1858.6, 1861.09.) Once the commissioner's decision is final, an insurer must charge only the approved rate. (§ 1861.01, subd. (c).) A consumer, however, may petition the commissioner to review the continued use of any rate. (§§ 1861.10, 1861.05, subd. (a).)" (*Walker v. Allstate Indemnity Co.* (2000) 77 Cal.App.4th 750, 753 [92 Cal.Rptr.2d 132] (*Walker*), fn. omitted.)

■ And, as stated, Proposition 103 entitles qualified applicants to receive a Good Driver Discount (§§ 1861.02, subd. (b), 1861.025); it prohibits insurers from using the lack of prior insurance, in and of itself, as a criterion in determining eligibility for the Good Driver Discount, or generally for automobile rates, premiums, and insurability (§ 1861.02, subd. (c)); it authorizes consumers to enforce that prohibition (§ 1861.10, subd. (a)); and it subjects the insurance industry to the laws—including the UCL—that are applicable to other types of businesses (§ 1861.03, subd. (a)). (See *Manufacturers Life Ins. Co. v. Superior Court, supra*, 10 Cal.4th at pp. 281–282 [discussing purpose of Proposition 103].) In addition, the Proposition repealed various provisions of the McBride Act that exempted the insurance industry from state antitrust laws (see former §§ 1850, 1850.1–1850.3, 1853, 1853.6, 1853.7, enacted by Stats. 1947, ch. 805, § 1, pp. 1896–1899, repealed by Proposition 103, § 7).

In its amicus curiae brief filed in this case, the California Department of Insurance succinctly describes Proposition 103's legislative history:

"In enacting Proposition 103, the voters vested the power to enforce the Insurance Code in the public as well as the Commissioner. As the plain text of Insurance Code sections 1861.03 and 1861.10 make[s] clear, Proposition 103 established a private right of action for [its] enforcement . . . .

"The voters expressly provided in Insurance Code section 1861.03(a), that the business of insurance is subject to the laws of California that are applicable to any other business, including the antitrust laws and the Unfair Business Practices Act. Moreover, Insurance Code section 1861.10(a) states that 'any person' is empowered to initiate 'any proceeding' established pursuant to Chapter 9 of the Insurance Code[, entitled "Rates and Rating and other Organizations,"] and [to] enforce any provision of Chapter 9, Article 10 of the Insurance Code[, entitled "Reduction and Control of Insurance Rates"]. Thus, in adopting Insurance Code sections 1861.03 and 1861.10, the voters envisioned that the Commissioner's ability to enforce the [specified] provisions of the Insurance Code would be supplemented by the use of private attorneys general."

## C. *Judicial Interpretation of Proposition 103*

We now turn to the issue of whether, under the McBride Act, as amended by Proposition 103, the Insurance Commissioner has *exclusive* jurisdiction over the type of claim raised in this case because plaintiff purportedly challenges the commissioner's ratemaking authority. We conclude that the commissioner does not have exclusive jurisdiction, nor does this case involve ratemaking.

As a preliminary matter, plaintiff alleges that Mercury unlawfully used the lack of prior insurance, in and of itself, as a criterion in determining eligibility for the Good Driver Discount, generally for automobile premiums and insurability, and in applying a persistency discount. Mercury argues that plaintiff cannot pursue alleged violations under the UCL unless he was a victim himself. On the contrary, "[t]he UCL permits 'any person acting for the interests of itself, its members or the general public' . . . to file an action for restitution and/or injunctive relief . . . against a person or business entity alleged to be engaged in any 'unlawful, unfair or fraudulent business act or practice . . . .' . . . [T]he UCL allows a private plaintiff who himself has suffered no injury to file a lawsuit under the UCL in order to obtain relief for others." (*Rosenbluth Internat., Inc. v. Superior Court* (2002) 101 Cal.App.4th 1073, 1076–1077 [124 Cal.Rptr.2d 844], citations omitted; accord, *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 560–561 [71 Cal.Rptr.2d 731, 950 P.2d 1086].)

Further, Mercury contends plaintiff failed to allege that it used the absence of prior insurance as a rating criterion *in and of itself.* That is not so. Under a fair reading of the complaint, plaintiff alleged that Mercury used the lack of prior insurance to (1) deny the Good Driver Discount to qualified applicants, (2) charge applicants higher premiums, (3) declare some applicants uninsurable, and (4) deny its persistency discount to applicants. And, as we now discuss, the UCL may be invoked to challenge that conduct.

In *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377 [6 Cal.Rptr.2d 487, 826 P.2d 730] (*Farmers*) our Supreme Court implied that a violation of Proposition 103 provides the basis for a UCL action. There, the Attorney General of California sued several insurers, alleging that they had unlawfully used the lack of prior insurance in denying the Good Driver Discount to eligible applicants. The complaint consisted of two causes of action: Count 1 alleged a violation of the Insurance Code sections governing the Good Driver Discount and the rating factors (§§ 1861.02, subds. (b)(1), (b)(2), (c), 1861.05, subd. (a)), and count 2 alleged a violation of the UCL based on the same sections of the Insurance Code. The Attorney General brought suit directly in superior court and did not use the formal administrative process set forth in the McBride Act (§§ 1858–1858.7).

The court began with a discussion of the UCL, stating: "Section 17200 of the Business and Professions Code broadly defines 'unfair competition' as, inter alia, any 'unlawful, unfair or fraudulent business practice . . . .' 'Unlawful business activity' proscribed under section 17200 includes ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' . . . '[I]n essence, an action based on Business and Professions Code section 17200 to redress an unlawful business practice "borrows" violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under section 17200 et seq. and subject to the distinct remedies provided thereunder.'

"Section 17205 of the Business and Professions Code states: 'Unless otherwise expressly provided, *the remedies or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state.*' . . . Section 17204 of the Business and Professions Code authorizes the Attorney General to prosecute an action to enjoin violations of section 17200 of the Business and Professions Code." (*Farmers, supra,* 2 Cal.4th at pp. 383–384, italics added in *Farmers.*)

Next, the court turned its attention to the provisions of the McBride Act that create a formal administrative process to remedy ratemaking violations. An aggrieved person may file a complaint with the commissioner, who will investigate the matter, conduct a public hearing if appropriate, and impose penalties for violations of ratemaking statutes and the commissioner's orders (§§ 1858–1858.5, 1859.1). The commissioner's decision is subject to judicial review by petition for writ of administrative mandate (§§ 1858.6, 1861.09). (*Farmers, supra,* 2 Cal.4th at pp. 384–386; see *Walker, supra,* 77 Cal.App.4th at p. 756.)

In *Farmers,* the court acknowledged the importance of section 1860.2, which states that the enforcement of the McBride Act, as amended, shall be

governed solely by its own provisions. (See *Farmers, supra,* 2 Cal.4th at pp. 382, fn. 1, 391.) Those provisions include the formal administrative process (§§ 1858–1858.7) and the "enforce[ment]" by "[a]ny person" of certain provisions (§ 1861.10, subd. (a)), including the statutory ban on using the absence of prior insurance as a rating criterion (§ 1861.02, subd. (c)).

The *Farmers* court then concluded: "[C]ount 1 of the People's complaint presented a question of exhaustion of administrative remedies; the People attempted to litigate Insurance Code claims over which the Insurance Commissioner has been given exclusive jurisdiction without first invoking and completing the available administrative process set out in the Insurance Code. . . . By contrast, count 2 of the complaint—the only count before us now—presents a different issue. The Business and Professions Code claim in count 2 is '*originally cognizable in the courts,*' and thus it triggers application of the primary jurisdiction doctrine." (*Farmers, supra,* 2 Cal.4th at p. 391, italics added.)

As the court explained: " 'Both [the doctrine of exhaustion of administrative remedies and the doctrine of primary jurisdiction] are essentially doctrines of comity between courts and agencies. They are two sides of the timing coin: Each determines whether an action may be brought in a court or whether an agency proceeding, or further agency proceeding, is necessary.' . . .

". . .' "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.' . . . 'Exhaustion applies where an agency alone has exclusive jurisdiction over a case; primary jurisdiction where both a court and an agency have the legal capacity to deal with the matter.' . . . [¶] . . . [¶]

". . . If . . . the Legislature does not preclude a court from exercising its discretion under the primary jurisdiction doctrine, a court may do so and, in appropriate cases, may decline to adjudicate a suit until the administrative process has been invoked and completed.

"[W]e conclude the legislative scheme at issue here does not address the primary jurisdiction issue, and a court thus is free to exercise its discretion to determine whether to stay proceedings in this suit pending action by the Insurance Commissioner. [¶] . . . [¶]

"[S]ection 1861.03[, which makes the UCL applicable to insurance practices,] does not condition a suit under Business and Professions Code section 17200 on prior resort to the administrative process under the Insurance Code. . . . [I]t does not speak to that issue at all. It merely modifies preexisting law, to provide, in essence, that insurers are subject to the unfair business practices laws in addition to preexisting regulations under the McBride Act, as amended. Section 1861.03 discloses no legislative preference for, or against, permitting a court to exercise its discretion under the primary jurisdiction doctrine to stay judicial proceedings pending action by the Insurance Commissioner. [¶] . . . [¶]

"[C]onsiderations of judicial economy, and concerns for uniformity in application of the complex insurance regulations here involved, strongly militate in favor of a stay to await action by the Insurance Commissioner in the present case.

"[C]ourts have observed that questions involving insurance rate making pose issues for which specialized agency fact-finding and expertise is needed in order to both resolve complex factual questions and provide a record for subsequent judicial review. . . . [¶] . . . [¶]

"To address the People's claim, one must inquire into the insurer's ratemaking process in order to determine what the rate would be for a given driver without the discount. Thereafter one must discern whether the rate offered on a given Good Driver Discount policy is 20 percent below what the insured would otherwise have been charged. . . .

"[A] court attempting to determine whether a given Good Driver Discount policy meets the statutory 20 percent discount requirements should have the benefit of the Insurance Commissioner's expert assessment of that issue. . . . [T]he Insurance Commissioner, rather than a court, is best suited *initially* to determine whether his or her own regulations pertaining to compliance have been faithfully adhered to by an insurer." (*Farmers*, *supra*, 2 Cal.4th at pp. 390–399, italics added and deleted.)

■ Thus, in light of *Farmers*, plaintiff's claim—Mercury used applicants' lack of prior insurance in violation of Proposition 103—was originally cognizable in the courts under the UCL. The claim did not involve the exhaustion of administrative remedies, and the commissioner therefore did not have exclusive jurisdiction over the matter. Indeed, pursuant to the doctrine of primary jurisdiction, the trial court stayed the action so that the Insurance Commissioner could review plaintiff's claim. Yet, after the commissioner issued his January 29, 2002 order, declining to hear the matter, the

trial court dismissed the suit on the ground that the commissioner's jurisdiction was exclusive. But under the primary jurisdiction doctrine, the commissioner was to provide only an *initial* assessment, not a final determination.[4]

■ Mercury argues that plaintiff's sole means of redress was to file a complaint with the Insurance Commissioner pursuant to the formal administrative process (§§ 1858–1858.7). We disagree. *Farmers* indicates that a claim under the UCL, though predicated on a violation of the Insurance Code, is not so restricted. (See *Farmers*, *supra*, 2 Cal.4th at pp. 382, fn. 1, 391.) This conclusion follows from Proposition 103's plain language.

■ Proposition 103 prohibits insurers from using the absence of prior insurance as a rating criterion (§ 1861.02, subd. (c)) and subjects insurers to the UCL (§ 1861.03, subd. (a)). The Proposition further provides: "Any person may initiate or intervene in any proceeding permitted or established pursuant to . . . chapter [9]." (§ 1861.10, subd. (a).) The formal administrative process is found in chapter 9. "Any person may [also] . . . enforce any provision of . . . article [10 of chapter 9]." (§ 1861.10, subd. (a).) The prohibition against using the lack of prior insurance as a rating criterion is found in article 10. Giving effect to all of these provisions, "[a]ny person" may *initiate or intervene in* the formal administrative process (established in chapter 9) and may *enforce* the ban on using the lack of prior insurance as a rating criterion (contained in article 10, chapter 9) by bringing a civil action under the UCL.

Thus, the trial court should have permitted this action to proceed on the merits. In *SCIF*, *supra*, 24 Cal.4th 930—a case similar to this one—the Supreme Court did just that. In *SCIF*, workers' compensation insurers were required by law to collect certain financial information about their insureds and provide the data to the Workers' Compensation Insurance Rating Bureau. The Department of Insurance used the information from the rating bureau to set minimum premiums to be charged the insureds. Several insureds initiated administrative proceedings against their insurer, alleging that the insurer had misallocated and misreported the insureds' information to the rating bureau, resulting in artificially inflated premiums that the insurer was allowed to collect. The insurer lost at every level of the administrative process. The superior court subsequently denied the insurer's petition for a writ of administrative mandate. The Court of Appeal affirmed.

---

[4] Plaintiff's September 17, 2001 letter to the Insurance Commissioner sought the commissioner's input on the parties' dispute under the primary jurisdiction doctrine and also requested that the commissioner treat the letter as a complaint under the formal administrative process (§§ 1858–1858.7). The commissioner decided not to reach the merits of the dispute but to promulgate regulations instead. In doing so, it appears that the commissioner chose not to review the matter administratively. (See §§ 1858–1858.02, 1858.1, 1858.2, 1858.3 [describing steps in administrative process].)

The insureds in *SCIF, supra,* 24 Cal.4th 930, also filed a civil action against the insurer based on the same allegations as the administrative charge. The insurer moved for judgment on the pleadings, arguing that the suit was barred by section 11758, which is virtually identical to section 1860.1 and provides: "No act done, action taken or agreement made pursuant to the authority conferred by this article shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance." The superior court denied the insurer's motion, the Court of Appeal summarily denied the ensuing petition for a writ of mandate, and the Supreme Court affirmed, explaining:

"[The insureds] assert[] that section 11758 grants immunity only for antitrust or concert of action claims, not claims that an insurer engaged in unilateral misconduct. Along these lines, [the insureds] disagree[] with [the insurer] that this is a ratemaking case; rather it is simply a garden variety bad faith insurance dispute. [The insurer] contends this is a ratemaking case, and that section 11758 bars all civil claims 'arising from workers' compensation rate-making disputes, unless brought under a statute which specifically relates to insurance.' Since none of [the insureds'] claims are brought under such a statute, they are barred by section 11758. . . .

"[W]hat is authorized by [section 11758] is 'cooperation between insurers, rating organizations and advisory organizations in ratemaking and other related matters to the end that the purposes of this chapter may be complied with and carried into effect.' . . . Such price-setting activity would arguably otherwise be barred by the antitrust laws. Thus, in order for the miscalculating and misreporting of loss information to fall within the scope of section 11758's immunity, it appears it must be related to such authorized cooperation in 'ratemaking and other related matters.' . . .

"Arguably, an insurer's act of reporting financial information to a rating organization is inextricably tied to the operation of a rating organization. That is, while the act of reporting (or misreporting) financial information is a unilateral act, it results in a rating organization receiving sufficient information from each insurer that it can set a minimum rate and appropriate premiums for each insured.

"Here, however, [the insureds] do[] not contend the mere act of reporting financial information to the Rating Bureau was misconduct. In particular, [the insureds] do[] not allege that [the insurer] violated any antitrust laws by reporting such information. Nor do[] [the insureds] challenge the manner in which premiums or rates are set by the Rating Bureau. Rather, [the insureds] dispute[] the manner in which [the insurer] analyzed and allocated [the

insureds'] financial data prior to the data being sent to the Rating Bureau. The Rating Bureau presumably had no way of knowing, absent an audit, that [the insurer had misallocated certain expenses].

"Of course, [the insureds] also allege[] that [the insurer] misreported [the insureds'] . . . expenses to the Rating Bureau, and this led to the imposition of excessive premiums. . . . [N]umerous Courts of Appeal decisions in other contexts have sanctioned civil claims against [this insurer] and other workers' compensation insurers alleging that their misconduct resulted in unjustifiably higher premiums. In all of these cases, the insurer had to first report the misinformation to the Rating Bureau before the premiums could be affected. [¶] . . . [¶]

"Given that premiums set for workers' compensation policies are dependent in part on the financial information submitted by the insurer, insurer misconduct in handling the insured's workers' compensation claims or other financial information can always potentially result in higher premiums. If we were to extend section 11758's immunity to the claims alleged in this case regarding analyzing and reporting financial information, liability for misconduct that resulted in higher premiums would arguably also be precluded in these other contexts.

"Interpreting section 11758 to only apply to concerted activity otherwise barred by the antitrust laws, and not to the individual misconduct of an insurer regarding its insured, is also supported by section 11758's legislative history. . . . Congress . . . granted insurers a moratorium from the Sherman Act, Clayton Act, and Federal Trade Commission Act until June 30, 1948, at which time they would become applicable 'to the extent that [the insurance] business is not regulated by State law.' . . . In response, the California Legislature enacted the McBride-Grunsky Insurance Regulatory Act of 1947. This act included *section 1860.1, which has language virtually identical to section 11758.* . . . [¶] . . . [¶]

"[T]he Department of Insurance, the government agency charged with enforcing the state's insurance laws, recently wrote to this court [and] . . . expressed the view, 'The purpose of [Insurance Code section 11758] is to immunize insurers and rating organizations from anti-trust laws so that they can act in concert to make rates. It has long been considered necessary to allow the insurance industry an exemption from the laws that prohibit other industries from actions done in concert that affect the price of their products. The extraordinary grant of immunity from prosecution or civil proceedings in Section 11758 must be seen in context—as a recognition of the unique status of the insurance industry within the framework of federal and state anti-trust law. . . . The plain language of Insurance Code Section 11758 does not

immunize an insurer from misconduct in reporting data to the rating organization. Furthermore, the legislative history of that statute indicates that it was intended to allow insurers to act in concert to make rates. The action of a single insurer in reporting data that is eventually used to make rates is not the same as a concert of action among entities in order to make rates.' . . . [¶] . . . [¶]

"[The case law] does not support the argument that section 11758 applies to an individual carrier's unilateral conduct.

[The insureds'] claim has no antitrust implications. [¶] . . . [¶]

"We are cognizant of the fact that the calculation of insurance premiums and interpretation of [the insurer's] reporting requirements as contained in the 1983 unit statistical plan is best suited to the administrative process. Here, however, the administrative process has run its course, and we enjoy the benefit of that expertise. In particular, at every level [the insurer] has been found to have committed malfeasance. Moreover, the formula by which premiums are determined, while complicated, is set by law and is public information, and hence the premium [the insureds] should have been charged is capable of calculation by experts in a trial court." (*SCIF*, *supra*, 24 Cal.4th at pp. 936–943, italics added, citations and fn. omitted.)

Mercury seeks to bar this action based on provisions of the McBride Act—sections 1860.1 and 1860.2—that predated Proposition 103 and were enacted to permit concerted action among insurers in setting rates. Like the statutory scheme in *SCIF*, *supra*, 24 Cal.4th 930, these two provisions of the McBride Act were adopted to immunize insurers from antitrust laws (see *SCIF*, *supra*, at pp. 938–940; *Amwest Surety Ins. Co. v. Wilson*, *supra*, 11 Cal.4th at pp. 1257–1258). In concluding that section 11758—section 1860.1's twin—did not immunize a workers' compensation insurer from liability for unilateral misconduct, the Supreme Court relied in part on the legislative history of the McBride Act. (See *SCIF*, *supra*, 24 Cal.4th at pp. 938–940.) In a similar fashion, we rely on that history.

Like the claim in *SCIF*, *supra*, 24 Cal.4th 930, plaintiff's claim challenges the unilateral conduct of a single insurer, does not involve concerted action, and has no antitrust implications. And the administrative process—namely, the doctrine of primary jurisdiction—has run its course. As the Department of Insurance states in its amicus curiae brief: "Whatever limited force Insurance Code sections 1860.1 and 1860.2 can be said to have today, a fair reading of those provisions in context cannot immunize insurers from civil liability for illegal procedures that are creatively stowed away in a voluminous regulatory filing." Of course, this is not to say that sections 1860.1 and 1860.2 no longer

serve any purpose. For example, insurers are still permitted to engage in some concerted and joint activity. (See, e.g., §§ 1853.5 [related insurers may act in concert in setting rates], 1853.8 [insurers may enter into agreements to equitably apportion casualty insurance afforded applicants], 1855–1855.5 [members and subscribers of advisory organization may use policy forms, bond forms, and manuals of that organization].)

In sum, as Mercury would have it, a violation of Proposition 103 would always fall within the exclusive jurisdiction of the Insurance Commissioner and would never give rise to a civil action in the first instance. But that interpretation is contrary to the Proposition's plain language and the analysis in *Farmers*, *supra*, 2 Cal.4th 377, and *SCIF*, *supra*, 24 Cal.4th 930. It would make little sense if Proposition 103—which subjects insurers to the UCL—were interpreted to preclude a civil action alleging a violation of that very Proposition.

Mercury's reliance on *Walker*, *supra*, 77 Cal.App.4th 750, is misplaced. There, "[t]he [insureds'] causes of action were each bottomed on the insurers' charging approved rates alleged nevertheless to be 'excessive' . . . . The complaint[, filed in February 1998,] supported [the] claim of 'excessive' premiums with numerous factual allegations regarding industry trends and rates of return earned by individual insurers. The complaint further alleged the existence of regulations that, on their face are applicable to the ratesetting process, but which cannot be (and have not been) used, because of the failure of the commissioner to adopt certain 'generic factors' necessary for the use of the formula set forth in the regulations. . . . Each cause of action against the insurers sought the redetermination of the premium rates in effect since September 1994 in accordance with certain statutory and regulatory criteria and a refund of the premiums collected in excess of the redetermined amounts." (*Id.* at p. 753.)

The trial court dismissed the action on demurrer. The Court of Appeal affirmed, stating: "(1) the time has long since lapsed to challenge the actions on which the complaint was based and (2) explicit statutory authority precludes any further civil challenges to those actions to recoup premiums charged pursuant to approved rates." (*Walker*, *supra*, 77 Cal.App.4th at p. 760.) The court also noted that "an insurer's action of collecting premiums consistent with an approved rate" did not provide a basis for liability. (*Id.* at p. 757.)

*Walker* is inapposite. Here, plaintiff alleges that Mercury violated a specific prohibition of Proposition 103: An insurer may not use the absence of prior insurance, in and of itself, as a criterion in determining eligibility for the Good Driver Discount, generally for automobile premiums and insurability,

or in applying a persistency discount (§ 1861.02, subd. (c)). In contrast, the challenge in *Walker* rested on amorphous concepts such as "industry trends," "rates of return earned by individual insurers," and "generic factors." (*Walker, supra*, 77 Cal.App.4th at p. 753.) *Walker* involved a challenge to approved rates. (*Id.* at pp. 753, 756–757, 759.) This case does not. (See *SCIF, supra*, 24 Cal.4th at pp. 941–942 [distinguishing *Walker*].)

Plaintiff contends the Insurance Commissioner did not approve Mercury's use of the lack of prior insurance to determine, for example, eligibility for the Good Driver Discount or insurability. In its amicus curiae brief, the Department of Insurance explains: "California automobile premiums are generally calculated in a two-step process.

"First, a company must calculate a 'base rate,' a figure which is the same for each policyholder and represents the total annual premium that the insurer must charge in order to cover expenses and obtain a reasonable rate of return. (*Spanish Speaking Citizens' Foundation, Inc. v. Low*[, *supra*,] 85 Cal.App.4th [at p. 1186].) The second step involves the weighting of 'rating factors' which will have a different effect on different policyholders, depending upon each policyholder's unique characteristics. (*Ibid.*)

"Much of the first step in the process, calculation of a base rate pursuant to section 1861.05, requires that an insurer provide a highly technical, formulaic, presentation of its loss, expense and claims data so that the Department can determine whether the base rate is excessive, inadequate or unfairly discriminatory. [(See generally Cal. Code Regs., tit. 10, §§ 2644.1–2644.23.)]

"The second step in this process, applicable only to automobile insurers, concerns the evaluation of the automobile rating factors under section 1861.02. Each insurer must file a 'class plan' with the Department. [(Cal. Code Regs., tit. 10, §§ 2632.3, 2632.5, 2632.6, 2632.9–2632.11.)] The class plan must be filed prior to use, so that the Department may ensure that the influence of each rating factor applied in an insured's premium is weighted as specified by the Department's regulations. [(*Id.*, §§ 2632.7, 2632.8.)] The calculation of weights also involves a highly technical, formulaic evaluation of the individual optional rating factors. (See generally, *Spanish Speaking Citizens' Foundation, Inc. v. Low*[, *supra*,] 85 Cal.App.4th 1179 [103 Cal.Rptr.2d 75] . . . .)

"Each of the steps described above represents the 'ratemaking' function of the Department's review process. Each requires the Commissioner to exercise his technical expertise. The summation of these steps operates to ensure not only that the ultimate rate filed with the Department is not excessive, inadequate or unfairly discriminatory, but also to ensure that the rating factors are weighted in the order prescribed by Proposition 103.

"[Plaintiff's] claim does not involve any of these ratemaking steps. A separate concern is whether the optional rating factors, *as applied*, comply with the Insurance Code. This is a critical distinction, and it is the issue that was before the trial court in the present case. It is possible for an insurance carrier to file with the Department a rate filing and class plan that satisf[y] all of the ratemaking components of the regulations, and still result in a violation of the Insurance Code *as applied*. Such a [situation] would not involve a question of rates, but rather, it could easily involve the very separate, factual question of how the components of the class plan are applied toward members of the public." (Italics in original.)

In its class plan applications, Mercury marked the appropriate boxes on the preprinted forms indicating that it uses persistency as a rating factor. In the applications, Mercury defined persistency as follows: "The Persistency discount is based on loss experience and the number of years the Named Insured has been continuously insured and no lapse of coverage in excess of 30 days. . . ."

█ The language in Mercury's class plan applications fails to establish that it did not use the absence of prior insurance, in and of itself, as a criterion in determining eligibility for the Good Driver Discount, generally for automobile premiums and insurability, or in applying its persistency discount. The complaint alleges that Mercury *did* use the absence of prior insurance in that way. Because this case comes to us after the sustaining of a demurrer without leave to amend, we accept the allegation as true. (See *Hensler v. City of Glendale*, *supra*, 8 Cal.4th at p. 8, fn. 3.) Accordingly, we conclude that plaintiff may seek relief under the UCL.

In closing, we emphasize what we do *not* decide: whether "persistency" means the length of time the insured has been continuously covered by the insurer issuing the policy (loyalty persistency) or, more broadly, the length of time continuously covered by *any* insurer (portable persistency). " ' "Proposition 103 [has] proved to be a problem child from its inception" ' . . . and that is perhaps nowhere more apparent than in this area of automobile insurance rating factors." (*Spanish Speaking Citizens' Foundation, Inc. v. Low*, *supra*, 85 Cal.App.4th at p. 1185, citation omitted.) While one court has stated in dicta that "persistency" means "years insured by *the* company" (*id.* at p. 1187, italics added), the record in this case suggests that even the Insurance Commissioner's office has not applied a consistent interpretation of the term.

And we decline to reach Mercury's assertion that, as a factual matter, the Insurance Commissioner not only approved its use of the lack of prior insurance as a rating criterion, but required it, notwithstanding the statutory

prohibition. For that point, Mercury relies on a November 25, 1994 report from the commissioner that reviewed its rating and underwriting practices as of September 30, 1994, and on an accompanying cover letter from the commissioner. But in documents filed with this court pursuant to motions to take judicial notice, the commissioner appears to dispute Mercury's reliance on the report, indicating that the report was a *draft,* which differed materially from the *final* report dated April 21, 1995.

■ Mercury contends the trial court made a "finding of fact" that the commissioner approved and required its use of the absence of prior insurance as a rating criterion, and we should affirm the finding because it is supported by substantial evidence. This contention ignores the limited role of a demurrer—to test the legal sufficiency of a complaint. (See Weil & Brown, Cal. Procedure Before Trial (The Rutter Group 2003) ¶¶ 7:8 to 7:17.4, pp. 7-6 to 7-12; *Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 882–887 [110 Cal.Rptr.2d 877].) In reviewing the ruling on a demurrer, a court cannot consider, as Mercury would have us do, the substance of declarations, matter not subject to judicial notice, or documents judicially noticed but not accepted for the truth of their contents. (See Weil & Brown, Cal. Procedure Before Trial, *supra,* ¶¶ 7:8 to 7:17.4, pp. 7-6 to 7-12; *Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort, supra,* 91 Cal.App.4th at pp. 882–887.)[5]

In addition, although a court may take judicial notice of a plaintiff's admissions (see *Rodas v. Spiegel* (2001) 87 Cal.App.4th 513, 518 [104 Cal.Rptr.2d 439]), the admission noted in Mercury's briefs—plaintiff conceded that the demurrer to the *original* complaint was properly sustained—is of no moment. Plaintiff appeals from the dismissal of the *first amended* complaint, and that pleading was based on a theory advanced on appeal: Mercury's rating factors and class plan, *as applied,* violated Proposition 103. Plaintiff's other purported admissions, as described in Mercury's briefs, either are not admissions or are irrelevant.

We therefore reverse the order and judgment of dismissal. Mercury's proffered evidence, which allegedly disproves plaintiff's claim, can be presented to the trial court in an appropriate manner after remand. Nothing we have said is intended to prejudge the determination of whether the Insurance Commissioner approved Mercury's use of the absence of prior insurance, in

---

[5] Mercury argues that its conduct was protected under the "safe harbor" doctrine (see *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 182 [83 Cal.Rptr.2d 548, 973 P.2d 527]) because the Insurance Commissioner approved its use of the absence of prior insurance as a rating criterion. As stated, we will not resolve that factual issue at the pleading stage. We therefore do not reach Mercury's "safe harbor" argument.

and of itself, as a criterion in determining eligibility for the Good Driver Discount, generally for automobile premiums and insurability, or in applying its persistency discount and, if so, its effect on this case.

## III

## DISPOSITION

The order of dismissal and the judgment are reversed. Plaintiff is entitled to costs on appeal.

Spencer, P. J., and Ortega, J., concurred.

A petition for a rehearing was denied March 30, 2004, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied June 23, 2004. Chin, J., did not participate therein.